# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YU LIANG, Derivatively on behalf of ARIAD PHARMACEUTICALS, INC., <br><br>        Plaintiff, <br><br>     v. <br><br> HARVEY J. BERGER, JAY R. LAMARCHE, ATHANASE LAVIDAS, MASSIMO RADAELLI, NORBERT G. RIEDEL, SARAH J. SCHLESINGER, ROBERT M. WHELAN, JR., WAYNE WILSON, FRANK G. HALUSKA, TIMOTHY P. CLACKSON, and EDWARD M. FITZGERALD, <br><br>        Defendants, <br><br> and <br><br> ARIAD PHARMACEUTICALS, INC., <br><br>        Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

By and through the undersigned counsel, Plaintiff Yu Liang ("Plaintiff") brings this shareholder derivative action on behalf of ARIAD Pharmaceuticals, Inc. ("ARIAD" or the "Company") and against certain officers and directors of the Company for breaches of fiduciary duties and unjust enrichment.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by ARIAD and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on ARIAD's website concerning the Company's public statements; and d) review of other publicly available information concerning ARIAD and the Individual Defendants (defined herein).

## **INTRODUCTION**

1.      Nominal Defendant ARIAD is a Cambridge, Massachusetts-based global oncology company which describes its focus as the discovery, development, and commercialization of medicines to transform the lives of cancer patients.  For much of the past three years, ARIAD's primary focus has been on demonstrating the purported safety and broad commercial marketability of its core product – the leukemia drug Iclusig ("Iclusig" or "Ponatinib").

2.      This action arises out of the efforts of the Individual Defendants from approximately June 7, 2010 through October 9, 2013 (the "Relevant Period") to artificially inflate the price of ARIAD's common stock by issuing and/or authorizing the issuance of materially false and misleading statements regarding the purported safety and broad commercial

1

marketability of Iclusig.  Moreover, throughout the Relevant Period the Individual Defendants breached their fiduciary duties to ARIAD and its shareholders by consciously failing to take reasonable steps to implement and ensure compliance with adequate internal disclosure controls while misleadingly claiming otherwise to the investing public.  Further, while in possession of material, adverse, nonpublic information about Iclusig, several Individual Defendants sold millions of dollars' worth of their own personally held ARIAD stock at artificially inflated prices.

3.      Specifically, from approximately June 7, 2010 through December 11, 2011, the Individual Defendants caused ARIAD to publish materially misleading statements about the progress and results of Iclusig's Phase I study that obscured known and significant safety issues with the drug that threatened its commercial viability.

4.      Then, from approximately December 11, 2011 through December 14, 2012, the Individual Defendants caused ARIAD to publish materially misleading statements about Iclusig's pivotal Phase III "PACE" clinical trial in which the Individual Defendants again hid known safety risks with the drug and instead began touting the "potential U.S. commercialization" of Iclusig by as early as the first quarter of 2013.  During this period, the price of ARIAD's common stock rose significantly, reaching an all-time high of $25.16 on October 5, 2012.  Also during this period, certain of the Individual Defendants took the opportunity to dump 477,608shares of their own ARIAD stock in highly unusual and suspicious trading patterns.

5.      Then, on December 14, 2012, the Individual Defendants caused the Company to announce that the U.S. Food and Drug Administration ("FDA") had granted ARIAD accelerated approval for Iclusig. In the ensuing months, the Individual Defendants caused ARIAD to begin

selling Iclusig in the United States and repeatedly and misleadingly touted the long-term commercial viability of the drug. During this time, certain of the Individual Defendants again took advantage of the Company's artificially inflated stock price and dumped even more of their personally-held ARIAD stock under highly unusual circumstances.

6.     In or around March 2013, however, questions and concerns over whether Iclusig was truly safe (and thus, whether its commercial marketability was truly broad, as the Individual Defendants caused ARIAD to represent) began to seep into the market. In response to these concerns, the Individual Defendants continued to cause ARIAD to reassure the public regarding Iclusig's safety and broad commercial marketability.

7.     In a further effort to hide these safety problems from the public, from March 2013 through July 2013, the Individual Defendants quietly authorized changes to the enrollment restrictions and dosage parameters in two ongoing Iclusig clinical trials. First, significant changes were made to the exclusion criteria governing the then-ongoing Phase III "EPIC" trial for Iclusig, which changes significantly expanded exclusion criteria relating to candidates who had suffered heart attacks, unstable angina, or congestive heart failure, and which added new restrictions excluding patients with a history of ventricular arrhythmia, a cerebrovascular accident or transient ischemic attack within the last six months, a history of clogged arteries requiring revascularization, or a history of blood clots. Then, in July 2013, the dosage for Iclusig in another ongoing study, the "Cortes" study, was reduced from 45 mg (the FDA approved dose) to 30 mg. These changes were not discussed or disclosed in ARIAD's filings with the SEC or any press releases. Instead, the Individual Defendants continued to cause ARIAD to reassure the investing public regarding Iclusig's purported safety and broad commercial marketability.

8. On October 9, 2013, however, the truth was revealed when ARIAD disclosed "updated" data from the Iclusig PACE trial, revealing that Iclusig caused a significantly higher rate of blood clots and heart-related side effects than previously disclosed. Specifically, the Company disclosed that serious arterial thrombosis occurred in 11.8% of Iclusig-treated patients, and that 6.2% of the patients had cardiovascular events and 4.0% had cerebrovascular events. As a result, the FDA placed a hold on new patient enrollment for Iclusig testing, and the Company advised patients currently receiving the drug to lower their dosages.

9. On this news, ARIAD shares declined $11.31 per share, or nearly 66%, to close at $5.83 per share on October 9, 2013.

10. Thereafter, on October 11, 2013, the FDA issued a "Safety Announcement," entitled "FDA Drug Safety Communication: FDA investigating leukemia drug Iclusig (ponatinib) after increased reports of serious blood clots in arteries and veins," warning of Iclusig's serious safety risks. A week later, on October 18, 2013, one or more of the Individual Defendants caused the Company to announce that that the Company "is discontinuing the Phase 3 EPIC … trial of Iclusig (ponatinib) in patients with newly diagnosed chronic myeloid leukemia," and further that "ARIAD and the U.S. Food and Drug Administration mutually agreed that the trial should be terminated because arterial thrombotic events were observed in patients treated with Iclusig."

11. On this news, ARIAD shares declined another $1.83 per share from the previous day's close, to close at $2.67 per share on October 18, 2013, a one-day decline of 40.67%.

12. Finally, on October 31, 2013, one or more of the Individual Defendants caused ARIAD to announce that, in compliance with a demand by the FDA, ARIAD was "temporarily" withdrawing Iclusig from the United States market. On this news, ARIAD shares declined $1.76

4

per share from the previous day's close, to close at $2.20 per share on October 31, 2013, a one-day decline of 44.4%. In total, from October 8, 2013 to October 31, 2013, ARIAD's shares declined an astounding 87.2%, shedding well over $2.5 billion of ARIAD's market capitalization in the process.

13.    The true facts, which were known or recklessly disregarded by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

   a)    Iclusig had long been known to cause serious arterial thrombosis in higher numbers of patients than previously reported;

   b)    As a result, there was no reasonable basis to conclude that Iclusig would ever become a commercially viable drug; and

   c)    As a result, the Individual Defendants' statements throughout the Relevant Period about Iclusig's safety and commercial prospects were materially false and misleading.

14.    Because of the Individual Defendants' materially false and misleading statements and failure to maintain adequate internal controls, ARIAD stock traded at inflated levels during the Relevant Period. But, after the above revelations seeped into the market, the price of ARIAD stock was hammered by massive sales, sending it down 87.2% in very high-volume trading.

15.    The ARIAD Board of Directors ("Board") has not, and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because the Individual Defendants (including the Board) face a substantial likelihood of liability to ARIAD for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to discharge their fiduciary duties of due diligence and reasonable care by failing to take reasonable steps to implement and ensure compliance with adequate policies and

procedures designed to meaningfully review and vet statements about the safety and commercial marketability of its products before publishing those statements.  Accordingly, a pre-suit demand upon the ARIAD Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate ARIAD's rights against its wayward fiduciaries and hold them responsible for the damages they have caused ARIAD.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over all claims under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this Court because ARIAD's principal corporate headquarters and principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts, 02139, where the day-to-day operations of the Company are directed and managed.  Moreover, Plaintiff's claims arose in this District, Plaintiff has suffered and will continue to suffer harm in this District, and each Defendant has extensive contact with Massachusetts.

## PARTIES

18.     Plaintiff is and at all relevant times has been a holder of ARIAD common stock. Plaintiff is a citizen of California.

19.     Nominal Defendant ARIAD is a Delaware corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 26 Landsdowne Street, Cambridge, Massachusetts 02139. ARIAD's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ARIA."

20.     Defendant Harvey J. Berger, M.D. ("Berger") was, at all relevant times, the Company's Chairman of the Board ("COB"), President, and Chief Executive Officer ("CEO").Berger has been COB and CEO of the Company since April 1991.  Berger is also Chair of the Board's Executive Committee.  Upon information and belief, Berger is a citizen of Massachusetts.

21.     Defendant Jay R. LaMarche ("LaMarche") is a director of the Company, member of the Board's Audit Committee, and member of the Board's Nominating and Corporate Governance Committee.  LaMarche has been a director of the Company since 1992.  Upon information and belief, LaMarche is a citizen of Florida.

22.     Defendant Athanase Lavidas, Ph.D. ("Lavidas") is a director of the Company, Chair of the Board's Nominating and Corporate Governance Committee, and member of the Board's Compensation Committee.  Lavidas has been a director of the Company since September 2003.  Upon information and belief, Lavidas is a citizen of Greece and/or New York.

23.     Defendant Massimo Radaelli, Ph.D. ("Radaelli") is a director of the Company, Chair of the Board's Compensation Committee, member of the Board's Audit Committee, and member of the Board's Nominating and Corporate Governance Committee.  Radaelli has been a director of the Company since September 2008.  Upon information and belief, Radaelli is a citizen of Italy.

24.     Defendant Norbert G. Riedel, Ph.D. ("Riedel") is a director of the Company and member of the Board's Audit Committee.  Riedel has been a director of the Company since April 2011.  Upon information and belief, Riedel is a citizen of Illinois.

25.     Defendant Sarah J. Schlesinger, M.D. ("Schlesinger") is a director of the Company.  Schlesinger has been a director of the Company since July 2013. Upon information and belief, Schlesinger is a citizen of New York.

26.     Defendant Robert M. Whelan, Jr. ("Whelan") is a director of the Company, member of the Board's Audit Committee, and member of the Board's Compensation Committee. Whelan has been a director of the Company since April 2010.  Upon information and belief, Whelan is a citizen of Maine.

27.     Defendant Wayne Wilson ("Wilson") is a director of the Company, Chair of the Board's Audit Committee, member of the Board's Nominating and Corporate Governance Committee, and member of the Board's Executive Committee.  Wilson has been a director of the Company since October 2008.   Upon information and belief, Wilson is a citizen of New Hampshire.

28.     Defendant Frank G. Haluska, M.D., Ph.D. ("Haluska") was, at all relevant times, the Company's Senior Vice President of Clinical Research and Development and Chief Medical Officer.  Upon information and belief, Haluska is a citizen of Massachusetts.

29.     Defendant Timothy P. Clackson, Ph.D. ("Clackson") is the Company's President of Research and Development and Chief Scientific Officer ("CSO").Clackson has been the Company's President of Research and Development since June 2010 and CSO since September 2003.  Upon information and belief, Clackson is a citizen of Massachusetts.

30.     Defendant Edward M. Fitzgerald ("Fitzgerald") is the Company's Executive Vice President ("EVP"), Chief Financial Officer ("CFO"), and Treasurer. Fitzgerald has been the Company's EVP since June 2010, and the Company's CFO and Treasurer since May 2002. Upon information and belief, Fitzgerald is a citizen of Massachusetts.

31.     The defendants referenced above in ¶¶20-30 are referred to herein as the "Individual Defendants."

32.     Defendants Berger, LaMarche, Lavidas, Radaelli, Riedel, Schlesinger, Whelan, and Wilson are all current Board members and are collectively referred to as the "Board" or the "Director Defendants."

33.     Defendants LaMarche, Radaelli, Whelan, Riedel, and Wilson are sometimes collectively referred to herein as the "Audit Committee Defendants."

34.     Defendants LaMarche, Lavidas, Radaelli, and Wilson are sometimes collectively referred to herein as the "Nominating and Corporate Governance Committee Defendants."

## BACKGROUND FACTS

35.     ARIAD is a Cambridge, Massachusetts-based global oncology company.  On its public web site, ARIAD describes the Company as "an integrated global oncology company focused on transforming the lives of cancer patients with breakthrough medicines. ARIAD is working on new medicines to advance the treatment of various forms of chronic and acute leukemia, lung cancer and other difficult-to-treat cancers.  ARIAD utilizes computational and structural approaches to design small-molecule drugs that overcome resistance to existing cancer medicines."

36.     ARIAD currently sells one product– Iclusig.  As discussed herein, ARIAD announced that the FDA had granted accelerated approval for Iclusig in December 2012.

## THE INDIVIDUAL DEFENDANTS MADE OR CAUSED ARIAD TO MAKEMATERIALLY MISLEADING STATEMENTS CONCERNING THE PURPORTED SAFETY AND BROAD COMMERCIAL MARKETABILITY OF ICLUSIG

### Statements Leading Up to the FDA's Accelerated Approval of Iclusig

37.     In a press release dated March 1, 2010, one or more of the Individual Defendants caused ARIAD to announce that ARIAD's investigational pan BCR-ABL inhibitor, AP24534 – soon to be known to the world as Ponatinib, and later, Iclusig – had been granted orphan status by the FDA and also by the European Medicines Agency ("EMA").  Further, the press release stated:

> "While impressive medical gains have been made over the past decade in treating various forms of leukemia, it is clear that the disease can be severe and life-threatening when it progresses," said Frank Haluska, M.D., Ph.D., vice president, clinical affairs of ARIAD. "Orphan drug designation for AP24534 highlights the lack of therapeutic options available for patients with CML or Ph+ ALL, who are resistant or refractory to currently available therapies. We expect to advance AP24534 into a pivotal registration trial later this year and pursue subsequent regulatory submissions for marketing authorization in these hematological cancers."
>
> ….
>
> **About AP24534**
>
> ARIAD's second oncology product candidate, AP24534, is an investigational pan-BCR-ABL inhibitor that has broad potential applications in cancer. ARIAD is currently completing a Phase 1 clinical trial of oral AP24534 in patients with advanced hematological cancers and plans to begin a pivotal registration trial of AP24534 later this year. Clinical proof-of-concept data from the Phase 1 trial provide clinical evidence of hematologic, cytogenetic and molecular anti-cancer activity of AP24534 in heavily pretreated patients with resistant and refractory chronic myeloid leukemia (CML), including those with the T315I mutation. In preclinical studies, AP24534 has also demonstrated potent inhibition of kinase targets associated with acute myeloid leukemia, as well as proliferation and angiogenesis in multiple solid tumors.

38.     Thereafter, through a press release dated June 7, 2010, one or more of the Individual Defendants caused ARIAD to begin touting both the performance and the purported safety of Iclusig on patients as demonstrated in a Phase I study:

> ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced updated clinical data from an ongoing Phase 1 study of its investigational pan-BCR-ABL inhibitor, AP24534, in patients with resistant and refractory chronic myeloid leukemia (CML). The data confirm strong clinical evidence of hematologic, cytogenetic and molecular anti-leukemia activity of AP24534, a multi-targeted kinase inhibitor, in heavily pretreated patients with CML, including those with the T315I mutation of the target protein, BCR-ABL….
>
> ….
>
> "The updated findings from this study confirm in a larger number of patients, that AP24534 continues to be well-tolerated and produce beneficial and durable anti-leukemia activity in patients who have failed prior tyrosine kinase inhibitor therapy for CML, including patients with the T315I mutation for which there are no currently available treatments," stated Moshe Talpaz, M.D., Associate Director of Translational Research and Associate Chief of Hematologic Malignancies, Trotman Professor of Leukemia Research, University of Michigan Medical Center, and study investigator….
>
> Updated results from the open-label, dose-escalating study presented at ASCO include:
>
> AP24534 was well tolerated at therapeutic dose levels including the newly evaluated 45 mg/day dose. This dose cohort was initiated in December 2009. With the exception of the DLTs of elevated amylase and lipase and grade 2 pancreatitis observed at 60 mg, the safety profile is similar when doses equal to or greater than 30 mg/day (the dose associated with sustained blood levels above the target inhibitory concentration) are compared with all doses in the trial.

39.     Similarly, through a press release later that year, dated December 4, 2010, one or more of the Individual Defendants caused ARIAD to announce:

> ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced updated clinical data from a fully enrolled and ongoing Phase 1 study of its investigational pan-BCR-ABL inhibitor, ponatinib, in patients with resistant and refractory chronic myeloid leukemia (CML) and

11

Philadelphia-positive acute lymphoblastic leukemia (Ph+ ALL). The study demonstrates that in chronic-phase CML patients treated with ponatinib, 66 percent of patients in the trial achieved a major cytogenetic response, including 100 percent of patients who also had a T315I mutation.

….

*Safety profile*

Ponatinib was well tolerated at therapeutic dose levels, including the 45 mg per day dose currently being used in the pivotal Phase 2 PACE trial. The treatment-related adverse event profile of ponatinib has remained consistent with additional patient experience.

The most common adverse events considered related to ponatinib included low-platelet count (in 23% of patients), rash (22%), arthralgia (15%), and headache (15%). Elevated serum enzymes (amylase and lipase), nausea, fatigue and myalgia were observed less frequently. These effects were mostly grade 1 or 2 and well tolerated by patients.

The dose-limiting toxicity (DLT) was elevated serum enzymes and grade 2 clinical pancreatitis, which occurred at 60 mg per day; these laboratory and clinical findings were also observed in one patient at the 45 mg per day dose level. Other than the DLT, the safety profile of ponatinib was similar when doses equal to or greater than 30 mg per day (the dose associated with sustained blood levels above the target inhibitory concentration) was compared with all doses in the trial.

….

"Importantly, the data provide evidence that ponatinib continues to be well tolerated across therapeutic dose levels and, in particular, at the 45 mg dose being studied in the pivotal Phase 2 PACE trial of ponatinib," added Dr. Haluska. "Pending successful completion of the PACE trial, this agent has the potential to represent a significant advance for CML patients who have become resistant or refractory to currently available therapies and who are in great need of new treatment options."

40.     ARIAD's press campaign directed by one or more of the Individual Defendants resumed in mid-2011.  In particular, through a press release dated June 3, 2011, one or more of the Individual Defendants caused ARIAD to announce:

CAMBRIDGE, Mass.--(BUSINESS WIRE)--ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced initial clinical findings on ponatinib in patients with advanced acute myeloid leukemia (AML). In addition to being an investigational pan-BCR-ABL inhibitor for use in chronic myeloid leukemia (CML), ponatinib selectively and potently inhibits certain other tyrosine kinases, including a specific mutation of FLT3 called the internal tandem duplication (ITD). This mutation has been implicated in about one-third of AML patients and is associated with a poor prognosis. These results are being presented today at the American Society of Clinical Oncology (ASCO) Annual Meeting in Chicago.

….

Ponatinib was well tolerated in this small group of AML patients, with a safety profile consistent with that observed in the broader Phase 1 study of ponatinib in patients with CML. All patients had treatment-emergent adverse events consistent with those expected in refractory AML. Three patients had grade 2 pancreatitis, one patient discontinued due to investigator decision, and two patients had their specific event resolve and continued therapy at a reduced dose.

"The safety and response data of ponatinib seen in these advanced AML patients highlight the potential of ponatinib in AML patients with alterations in FLT3, a target against which its activity is similar to that already observed in CML patients," stated Frank G. Haluska, M.D., Ph.D., vice president of clinical research and development and chief medical officer at ARIAD….

41.     Later, through a press release dated September 26, 2011, one or more of the

Individual Defendants caused ARIAD to announce:

ESTORIL, Portugal & CAMBRIDGE, Mass., Sep 26, 2011 (BUSINESS WIRE) -- ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced long-term results of the Phase 1 study of its investigational pan-BCR-ABL inhibitor, ponatinib, in heavily pretreated patients with resistant and refractory chronic myeloid leukemia (CML) and Philadelphia-positive acute lymphoblastic leukemia (Ph+ ALL). With the trial fully enrolled and all patients evaluable, 72% of chronic-phase CML patients treated with ponatinib achieved a major cytogenetic response (MCyR), including 92% of patients who also had a T315I mutation. Since the last data update from the trial was presented in December, 2010, all chronic-phase CML patients who achieved a MCyR remain in response with no signs of resistance.

….

*Safety profile (N=81)*

There have been no new significant safety findings on ponatinib in this trial. Ponatinib continues to be well tolerated at therapeutic dose levels, including the 45 mg per day dose currently being used in the pivotal Phase 2 PACE trial.

The most common adverse events considered related to ponatinib included low-platelet count (in 27% of patients), rash (30%), arthralgia (16%), and headache (15%). Elevated serum enzymes, nausea, fatigue and myalgia were observed less frequently. These effects were mostly grade 1 or 2 and well tolerated by patients. The incidence of pancreatitis was 12%. Pancreatitis was previously determined to be the dose-limiting toxicity that occurred mostly in patients at the 60 mg per day dose.

"These results reaffirm sustained durable responses to ponatinib with median time on ponatinib treatment still not reached among chronic-phase patients, as well as response rates that are remarkable in this refractory patient population," said Frank G. Haluska, M.D., Ph.D., vice president and chief medical officer of ARIAD.  "Importantly, the data show no new significant safety findings on ponatinib and provide further evidence that ponatinib continues to be well tolerated across therapeutic dose levels including at the 45 mg dose being studied in the pivotal PACE trial," added Dr. Haluska….

42.     Then, through a press release dated November 17, 2011, one or more of the

Individual Defendants caused ARIAD to announce that, the following month, at a conference in

San Diego, ARIAD would be presenting clinical data from its Ponatinib PACE trial:

ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced that interim clinical data from the fully enrolled, pivotal PACE trial of its investigational, pan-BCR-ABL inhibitor, ponatinib, will be presented at the 53rd Annual Meeting of the American Society of Hematology (ASH) being held in San Diego, December 10-13, 2011. The interim findings from the PACE trial will be featured in an oral presentation on Sunday, December 11 and also will be highlighted in an investor meeting to be webcast live from San Diego. This trial is being conducted in patients with chronic myeloid leukemia (CML) and Philadelphia-chromosome positive acute lymphoblastic leukemia (Ph+ ALL) who are resistant or intolerant to either nilotinib or dasatinib, two currently available CML therapies, or those who have the T315I mutation of BCR-ABL for which no current treatments are known to be effective. Thirteen additional

abstracts describing clinical and non-clinical work on ponatinib will also be presented at the meeting.

43.    Soon thereafter, on December 11, 2011, one or more of the Individual Defendants caused ARIAD to issue a press release announcing the preliminary data from its PACE trial of ponatinib that ARIAD had presented at the ASH meeting. The press release announced (in part):

> SAN DIEGO, Calif. & CAMBRIDGE, Mass.--(BUSINESS WIRE)-- Dec. 11, 2011-- ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced preliminary clinical data from the pivotal PACE trial -- a fully enrolled and ongoing Phase 2 study of its investigational pan-BCR-ABL inhibitor, ponatinib, in patients with chronic myeloid leukemia (CML) or Philadelphia-positive acute lymphoblastic leukemia (Ph+ ALL), who are resistant or intolerant to dasatinib or nilotinib or who have the T315I mutation. These initial data demonstrate that 47 percent of chronic-phase CML patients in the trial achieved a major cytogenetic response to date, including 65 percent of patients who have a T315I mutation. Approximately half of these patients had no more than a single bone-marrow assessment, while the remainder had two or more assessments.

> ....

> "The preliminary findings from the global PACE trial confirm strong clinical evidence of the anti-leukemic activity of ponatinib in patients who are resistant or intolerant to dasatinib or nilotinib, or who have the T315I mutation for which there are no currently available treatments," stated Jorge Cortes, M.D., professor and deputy chair, Department of Leukemia, The University of Texas M.D. Anderson Cancer Center, Houston, TX.

> "These results are very attractive even at this early stage of the study when most patients have only had one or two assessments for cytogenetic response because of the short follow-up," he added. "We know from the Phase 1 clinical trial of ponatinib that response rates increase over time, and we expect this to be the same on PACE. We are very pleased with the strength of these preliminary data that are similar to initial response results reported in the Phase 1 setting."

44.    Regarding the perceived safety of Ponatinib, in the December 11, 2011 press release, one or more of the Individual Defendants caused ARIAD to announce:

> ***Safety profile (N=449)***

Initial safety data show ponatinib to be well tolerated.

- the most common adverse events considered related to ponatinib included rash (in 32% of patients), thrombocytopenia (31%), dry skin (24%), abdominal pain (19%), and headache (17%). Elevated serum lipase, nausea, fatigue and myalgia were observed less frequently. These effects were mostly grade 1 or 2 and were well tolerated by patients in the trial. The incidence of pancreatitis across the study and including all grades was 6%. No patient discontinued participation in the trial due to pancreatitis. Pancreatitis was previously determined to be the dose-limiting toxicity of ponatinib in the Phase 1 trial.

Four on-study deaths were deemed by investigators as possibly or probably related to ponatinib treatment; three of these had advanced-phase CML or Ph+ ALL. All four of these patients had complex, confounding medical conditions. Based on data entered into the clinical database by investigators, the deaths were due to pneumonia, fungal pneumonia, gastric hemorrhage and cardiac arrest (one each). There was no evidence of any ponatinib-specific findings emerging.

45.    Further, the December 11, 2011 press release quotes Haluska on Ponatinib's safety as follows:

"Importantly, this initial assessment of the PACE trial provides further evidence of a favorable safety and tolerability profile of ponatinib in resistant or intolerant CML patients. The adverse event profile is similar to what was seen in the earlier Phase 1 study of ponatinib, although the incidence of pancreatitis is less in the PACE trial. The four deaths that were deemed to be treatment related were likely linked to the advanced nature of their disease, including the myelosuppressive effects of ponatinib on already badly damaged bone marrows," added Dr. Haluska.

46.    On February 28, 2012, one or more of the Individual Defendants caused the Company to announce financial results for its fourth quarter and year ended December 31, 2011, and provide an update on corporate developments. The press release included the following statements (among others) about Ponatinib:

**Advancing Ponatinib to Potential U.S. Commercialization by 1Q of 2013**

We expect our investigators to present updated clinical data from the PACE trial at the annual meeting of the American Society of Clinical Oncology in June, 2012. These data will form the basis of our regulatory filings for marketing approval of ponatinib in the U.S., Europe and other geographies.

We had a successful Pre-NDA meeting with the U.S. Food and Drug Administration (FDA). Regulatory filings in the U.S. and in Europe are proceeding as planned for submission in 3Q of 2012.

We secured agreement with U.S. and European regulatory authorities on the design of a Phase 3 trial of ponatinib in patients with newly diagnosed CML and the regulatory paths going forward. We expect the global trial to begin in 3Q of 2012 and to have the following features:

- Approximately 500 patients randomized 1:1
- Ponatinib *vs.* imatinib, each given at standard doses
- Primary endpoint of major molecular response rate at 12 months

We showed that ponatinib can be administered with or without a meal (*i.e.,* no food effect) and has no effect on cardiac repolarization (*i.e.,* no QT prolongation) in patients – both important differentiators, especially in the newly diagnosed CML setting….

47.     On February 29, 2012, one or more of the Individual Defendants caused the Company to file an annual report with the SEC on a Form 10-K for the year ended December 31, 2011 which was signed by Berger, Fitzgerald, and the Director Defendants (except for Schlesinger). In addition, the Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act ("SOX") signed by Berger and Fitzgerald, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

48.     Through the Form 10-K for the year ended December 31, 2011, one or more of the Individual Defendants caused the Company to represent the following concerning the Company's pivotal PACE trial and Ponatinib:

Ponatinib is an investigational pan BCR-ABL inhibitor that we believe has broad potential applications in various hematological cancers and solid tumors. Ponatinib was internally discovered and is wholly owned by us. Results from preclinical studies showed that ponatinib potently inhibits BCR-ABL, a target protein associated with drug-resistant CML, as well as various mutants of BCR-ABL.

....

In December 2011, we announced preliminary clinical data from the pivotal PACE trial at the American Society of Hematology, or ASH, conference. The initial data demonstrated that 47 percent of chronic phase CML patients in the trial achieved a major cytogenetic response to date, including 65 percent of patients who had the T315I mutation. Approximately half of these patients had no more than a single bone-marrow assessment, while the remainder had two or more assessments. Initial safety data showed ponatinib to be well tolerated. We expect to conduct a complete analysis of the maturing PACE clinical trial data in preparation for our planned submission of a New Drug Application, or NDA, with the U.S. Food and Drug Administration, or FDA, and a Marketing Authorization Application, or MAA, with the European Medicines Agency, or EMA, in the third quarter of 2012.

49.     Thereafter, on May 9, 2012, one or more of the Individual Defendants caused the

Company to publish a press release announcing financial results for its first quarter ended March

31, 2012 and announcing further development progress for Ponatinib:

Updated clinical data from the pivotal PACE trial of ponatinib, our investigational pan-BCR-ABL inhibitor in patients with chronic myeloid leukemia (CML) and Philadelphia-chromosome positive acute lymphoblastic leukemia (Ph+ALL), will be presented at the annual meeting of the American Society of Clinical Oncology (ASCO) on Monday, June 4, 2012. The ASCO presentation will include at least six months of available response data from all patients enrolled in the trial and will form the basis of our regulatory filings for marketing approval of ponatinib in the U.S., Europe and other geographies.

50.     Also on May 9, 2012, one or more of the Individual Defendants caused the

Company to file a quarterly report with the SEC on a Form 10-Q for the first quarter ended

March 31, 2012 which was signed by Berger and Fitzgerald. In addition, the Form 10-Q

contained certifications pursuant to SOX signed by Berger and Fitzgerald, stating that the

financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     The Form 10-Q for the first quarter ended March 31, 2012stated, in part:

> Ponatinib, previously known as AP24534, is an investigational pan BCR-ABL inhibitor that we believe has potential applications in various hematological cancers and solid tumors. In the third quarter of 2011, we completed patient enrollment in a pivotal Phase 2 clinical trial of ponatinib in patients with resistant or intolerant chronic myeloid leukemia, or CML, or Philadelphia positive acute lymphoblastic leukemia, or Ph+ ALL. Subject to further patient follow-up and data analysis in this trial, we expect to file for marketing approval of ponatinib in the United States and Europe in the third quarter of 2012 with potential regulatory approval in the United States as soon as the first quarter of 2013. Subject to obtaining marketing approval, we intend to commercialize ponatinib in the United States and Europe and other select markets worldwide. We also plan to initiate additional clinical trials of ponatinib, including a Phase 3 clinical trial in newly diagnosed CML patients, and commence clinical trials of ponatinib in Japan, in the second half of 2012.

52.     Thereafter, on June 4, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing updated data from the Ponatinib PACE trial, which ARIAD presented at the American Society of Clinical Oncology annual meeting held on that same day in Chicago, Illinois.  The press release announced, in part:

> ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced updated clinical data from the pivotal PACE trial of its investigational pan-BCR-ABL inhibitor, ponatinib, in patients with chronic myeloid leukemia (CML) or Philadelphia-positive acute lymphoblastic leukemia (Ph+ ALL), who are resistant or intolerant to dasatinib or nilotinib or who have the T315I mutation. These data show that 54 percent of chronic-phase CML patients in the trial, including 70 percent of patients who have a T315I mutation, achieved a major cytogenetic response. ARIAD expects to file for regulatory approval of ponatinib in the U.S. and the EU in the third quarter of 2012 based on these clinical data.

> ….

> • **Safety profile (N=449)**

19

○ Updated safety data show ponatinib to have a favorable profile in these heavily pretreated patients.

○ The most common adverse events considered related to ponatinib included thrombocytopenia (in 35% of patients), rash (32%), dry skin (30%), abdominal pain (22%), and headache (18%). Elevated serum lipase, fatigue and arthralgia were observed less frequently.

○ The incidence of pancreatitis across the study and including all grades was 6%. Pancreatitis was previously determined to be the dose-limiting toxicity of ponatinib in the Phase 1 trial.

"These updated findings of the PACE trial show beneficial responses and an increasing molecular response rate to ponatinib," said Frank G. Haluska, M.D., Ph.D., senior vice president and chief medical officer of ARIAD. "Importantly, these data provide clear evidence of a favorable safety and tolerability profile of ponatinib in resistant or intolerant CML patients. The adverse event profile is similar to what was seen in the earlier Phase 1 study of ponatinib, although the incidence of pancreatitis is less in the PACE trial," added Dr. Haluska.

53. Similarly, on June 18, 2012, one or more of the Individual Defendants caused the

Company to issue another press release announcing updated data from the Ponatinib PACE trial,

which announced (in part):

ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced updated clinical data from the pivotal PACE trial of its investigational pan-BCR-ABL inhibitor, ponatinib, in patients with chronic myeloid leukemia (CML) or Philadelphia-positive acute lymphoblastic leukemia (Ph+ ALL), who are resistant or intolerant to dasatinib or nilotinib or who have the T315I mutation. These data show that 54 percent of chronic-phase CML patients in the trial, including 70 percent of patients who have a T315I mutation, achieved a major cytogenetic response.

….

● *Safety profile (N=449)*

○ Updated safety data show ponatinib to have a favorable profile in these heavily pretreated patients.

○ The most common adverse events considered related to ponatinib included thrombocytopenia (in 35% of patients), rash (32%), dry skin (30%), abdominal pain (22%), and headache (18%). Elevated serum lipase, fatigue and arthralgia were observed less frequently.

○ The incidence of pancreatitis across the study and including all

grades was 6%. Pancreatitis was previously determined to be the dose-limiting toxicity of ponatinib in the Phase 1 trial.

"These updated findings of the PACE trial show beneficial responses and an increasing molecular response rate to ponatinib," said Frank G. Haluska, M.D., Ph.D., senior vice president and chief medical officer of ARIAD. "Importantly, these data provide clear evidence of a favourable safety and tolerability profile of ponatinib in resistant or intolerant CML patients. The adverse event profile is similar to what was seen in the earlier Phase 1 study of ponatinib, although the incidence of pancreatitis is less in the PACE trial," added Dr. Haluska.

54.     Shortly thereafter, on July 27, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing the initiation of the EPIC trial, a randomized Phase 3 trial of Ponatinib in adult patients with newly diagnosed chronic myeloid leukemia ("CML"):

The **EPIC** (**E**valuation of **P**onatinib versus **I**matinib in **C**hronic Myeloid Leukemia) trial is designed to provide definitive clinical data to support regulatory approval of ponatinib in treatment-naïve CML patients. The efficacy of ponatinib will be assessed in comparison to imatinib based on evaluation of the primary endpoint of major molecular response (MMR) rate at 12 months. ARIAD expects to complete patient enrollment in the trial by the end of 2013.

"The start of the EPIC trial represents an important milestone in the development of ponatinib in CML and builds on the strong clinical data that we have obtained to date in patients with more advanced disease. We have designed the EPIC trial with comprehensive and well-aligned input from key opinion leaders and regulatory authorities in the United States, Europe and Japan and anticipate strong interest from investigators and their patients," stated Harvey J. Berger, M.D., chairman and chief executive officer of ARIAD….

55.     Then, on July 30, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing the submission by ARIAD to the FDA of a New Drug Application ("NDA") for Ponatinib:

ARIAD's NDA is a rolling submission that includes all sections of the application and will be completed by the addition of a final subset of routine chemistry, manufacturing, and controls (CMC) data that the

Company plans to submit to the FDA later in the third quarter. The FDA has communicated to ARIAD that it intends to begin immediate, comprehensive review of the NDA based on today's rolling submission. ARIA anticipates approval and commercial launch of ponatinib in the U.S. in the first quarter of 2013.

Results from the ongoing Phase 2 PACE trial of ponatinib reported in June at this year's annual meeting of the American Society of Clinical Oncology showed that 54 percent of chronic-phase CML patients who were resistant or intolerant to tyrosine kinase inhibitor therapy in the trial, including 70 percent of patients who have a T315I mutation, achieved a major cytogenetic response (MCyR) – the primary endpoint of the PACE trial. Thirty percent of these same patients achieved a major molecular response (MMR). MMR is the primary endpoint of ARIAD's Phase 3 EPIC trial comparing ponatinib to imatinib that is now underway in newly diagnosed chronic-phase CML patients.

56.     On August 2, 2012, one or more of the Individual Defendants caused the Company to publish a press release announcing financial results for its second quarter ended June 30, 2012. The press release, in part, discussed ARIAD's progress in commercializing Ponatinib:

### Ponatinib Moving Closer to Potential U.S. Commercialization in 1Q of 2013

- A New Drug Application (NDA) is now under review by the U.S. Food and Drug Administration (FDA) for U.S. marketing approval of ponatinib in patients with resistant or intolerant chronic myeloid leukemia (CML) and Philadelphia-chromosome positive acute lymphoblastic leukemia (Ph+ ALL). ARIAD's NDA is a rolling submission that includes all sections of the application and will be completed by the addition of a small subset of routine chemistry, manufacturing, and controls (CMC) data that will be submitted later in the third quarter. The FDA has communicated to ARIAD that it intends to begin immediate, comprehensive review of the NDA based on this rolling submission. ARIAD is seeking accelerated approval of ponatinib and has requested a priority review of the application. The Company anticipates approval and commercial launch of ponatinib in the U.S. in the first quarter of 2013.

- Regulatory submission preparations for ponatinib in the European Union are advancing on schedule for submission this quarter. The Committee for Medicinal Products for Human Use (CHMP) recently granted an accelerated assessment designation for the ponatinib marketing

authorization application (MAA) potentially decreasing the regulatory review time. An accelerated assessment is granted to product candidates that address major unmet medical needs or constitute a significant improvement over currently available therapies.

- A Phase 3, global clinical trial of ponatinib in patients with newly diagnosed CML is now underway and enrolling patients. The EPIC (**E**valuation of **P**onatinib versus **I**matinib in **C**hronic Myeloid Leukemia) trial is a randomized, two-arm, multicenter trial that compares the efficacy of ponatinib with that of imatinib in adult patients with newly diagnosed CML in the chronic phase.

- Among several important design features, the EPIC trial provides for an interim analysis of efficacy, which will take place 12 months after half of the patients in the trial have been randomized. The interim analysis will focus on the primary endpoint of the major molecular response rate at 12 months of treatment and, depending on the results, may allow ARIAD to file for regulatory approval of ponatinib in the newly diagnosed CML clinical setting approximately six months earlier than otherwise. ARIAD anticipates full patient enrollment in the study by the end of 2013.

- A Phase 1/2 clinical trial of ponatinib in Japan is expected to begin on schedule in the third quarter. The trial is designed to establish a recommended dose of ponatinib in Japanese patients, confirm its anti-leukemic activity in this patient population, and provide the necessary data required for initial regulatory approval of ponatinib in Japan.

- More than 250 patients with CML and Ph+ALL in 16 countries are now receiving ponatinib through expanded access programs, including an expanded access protocol in the U.S. and a named-patient program in Europe.

57.    On August 9, 2012, one or more of the Individual Defendants caused the Company to file a quarterly report with the SEC on a Form 10-Q for the second quarter ended June 30, 2012 which was signed by Berger and Fitzgerald. In addition, the Form 10-Q contained certifications pursuant to SOX signed by Berger and Fitzgerald, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     The Form 10-Q for the second quarter ended June 30, 2012 represented (in part) regarding Ponatinib:

> Ponatinib is an investigational pan BCR-ABL inhibitor that we believe has potential applications in various hematological cancers and solid tumors. In the third quarter of 2011, we completed patient enrollment in a pivotal Phase 2 clinical trial of ponatinib, which we refer to as the PACE trial, in approximately 450 patients with resistant or intolerant chronic myeloid leukemia, or CML, or Philadelphia positive acute lymphoblastic leukemia, or Ph+ ALL, who are resistant or intolerant to dasatinib or nilotinib or who have the T315I mutation. In June 2012, we announced updated clinical data from the PACE trial that showed that 54% of chronic-phase CML patients in the trial, including 70% of patients who have a T315I mutation, achieved a major cytogenetic response. The most common adverse events considered related to ponatinib included thrombocytopenia, rash, dry skin, abdominal pain, and headache.
>
> We have filed for regulatory approval of ponatinib in the United States based on the results of the PACE clinical trial and expect potential regulatory approval as soon as the first quarter of 2013. We also expect to file for regulatory approval of ponatinib in Europe in the third quarter of 2012. Subject to obtaining marketing approval, we intend to commercialize ponatinib in the United States and Europe and other select markets worldwide. We have initiated a Phase 3 clinical trial of ponatinib in newly diagnosed CML patients. We plan to initiate additional clinical trials of ponatinib, including a clinical trial of ponatinib in Japan, in the second half of 2012.

59.     On September 27, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing the completion of ARIAD's rolling submission to the FDA of the NDA for Ponatinib.

60.     On November 7, 2012, one or more of the Individual Defendants caused the Company to publish a press release which announced financial results for its third quarter ended September 30, 2012.  The press release also provided an update on Ponatinib's development:

**Ponatinib Clinical Development Progress**

The U.S. Food and Drug Administration (FDA) accepted for filing the New Drug Application (NDA) of ponatinib in patients with resistant or

intolerant CML or Philadelphia-chromosome positive acute lymphoblastic leukemia (Ph+ ALL). The FDA granted ARIAD's request for Priority Review of ponatinib and established an action date of March 27, 2013 under the Prescription Drug User Fee Act (PDUFA). The Company anticipates approval and commercial launch of ponatinib in the U.S. in the first quarter of 2013.

ARIAD also submitted a Marketing Authorization Application (MAA) for ponatinib to the European Medicines Agency (EMA). ARIAD is seeking marketing approval in the European Union of ponatinib in adult patients with resistant or intolerant CML or Ph+ ALL. The Committee for Medicinal Products for Human Use (CHMP) granted ARIAD's request for accelerated assessment of the MAA, potentially decreasing the regulatory review time. ARIAD anticipates approval of ponatinib in the E.U. in the third quarter of 2013.

Approximately 100 patients with CML or Ph+ALL at 23 centers in the U.S. are now receiving ponatinib through an expanded access protocol. Forty of these patients are in the chronic-phase of the disease. Patients on this expanded access protocol could be eligible to transition to commercial use of ponatinib following its anticipated approval early next year. These U.S. patients are part of a broad, global expanded access program that includes more than 400 patients, some of whom are receiving ponatinib through compassionate-use programs.

ARIAD will present follow-up data from the pivotal Phase 2 PACE trial at the upcoming American Society of Hematology (ASH) Annual Meeting that will be held in Atlanta, GA, December 8 to 11, 2012. The ASH presentation will include 12 months of available response rate and duration of response data from the patients enrolled in the trial.

Patient enrollment is underway in the global, Phase 3 EPIC trial of ponatinib in patients with newly diagnosed CML. This trial compares ponatinib to imatinib and has a primary endpoint of major molecular response at 12 months. ARIAD anticipates full patient enrollment in the trial by end of 2013, and the study includes an interim analysis of the primary endpoint 12 months after half of the approximately 500 patients in the trial have been enrolled.

61.     On November 9, 2012, one or more of the Individual Defendants caused the Company to file a quarterly report with the SEC on a Form 10-Q for the third quarter ended September 30, 2012 which was signed by Berger and Fitzgerald. In addition, the Form 10-Q contained certifications pursuant to SOX signed by Berger and Fitzgerald, stating that the

financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

62.     The Form 10-Q for the quarter ended September 30, 2012 disclosed the following regarding Ponatinib:

> Ponatinib is an investigational pan BCR-ABL inhibitor that we believe has potential applications in various hematological cancers and solid tumors. In the third quarter of 2011, we completed patient enrollment in a pivotal Phase 2 clinical trial of ponatinib, which we refer to as the PACE trial, in approximately 450 patients with resistant or intolerant chronic myeloid leukemia, or CML, or Philadelphia positive acute lymphoblastic leukemia, or Ph+ ALL, who are resistant or intolerant to dasatinib or nilotinib or who have the T315I mutation. In June 2012, we announced updated clinical data from the PACE trial that showed that 54% of chronic-phase CML patients in the trial, including 70% of patients who have a T315I mutation, achieved a major cytogenetic response. The most common adverse events considered related to ponatinib included thrombocytopenia, rash, dry skin, abdominal pain, and headache.

63.     On November 28, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing the publication of Ponatinib Phase I Clinical Trial Results in the New England Journal of Medicine.  Regarding safety, the press release stated:

> Dose-limiting toxicities reported in the study included elevated lipase or amylase levels and pancreatitis. The most common treatment-related adverse events included rash (32%), thrombocytopenia (27%), arthralgia (17%), increased lipase (15%), fatigue (14%), acneiform dermatitis (14%), dry skin (14%), and nausea (14%). Neutropenia, headache, hypertriglyceridemia and myalgia occurred less frequently. The incidence of pancreatitis was 14% across all dose levels in the trial. The onset of pancreatitis, elevated amylase, and elevated lipase was dose-related with regard to both incidence and timing.

64.     On December 9, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing 12-month data from the PACE trial of Ponatinib. Regarding Ponatinib's safety profile, one or more of the Individual Defendants caused ARIAD to represent:

*Safety profile (N=449)*

> The most common non-hematologic treatment-emergent adverse events in the PACE trial included rash (in 38% of patients), abdominal pain (38%), headache (35%), dry skin (35%), and constipation (34%), with the majority of these being grades 1 or 2 in severity.

> The most common hematologic treatment-emergent adverse events were thrombocytopenia (42%), neutropenia (24%), and anemia (20%), which were primarily grades 3 or 4 in severity.

> Pancreatitis and pneumonia were the most common non-hematologic treatment-emergent serious adverse events (5% each), followed by abdominal pain (4%), myocardial infarction (3%), congestive heart failure (3%), atrial fibrillation (3%), and pyrexia (3%). The most common hematologic serious adverse events were anemia, febrile neutropenia, and thrombocytopenia (3% each).

65.     The next day, December 10, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing long-term molecular response data on Ponatinib. In discussing safety, the press release stated (in relevant part):

> The studies now show that 51 percent of chronic-phase CML patients in the Phase 1 trial achieved a major molecular response (MMR) with a median follow-up of 30 months, and 34 percent of chronic-phase patients achieved MMR in the PACE trial with a median follow-up of 15 months.

> ….

> **Phase 1 Trial MMR Rates in Chronic-Phase CML Patients**

> The ongoing Phase 1 dose-escalation study of ponatinib enrolled 81 patients with resistant or refractory hematologic cancers, including 43 patients with chronic-phase CML. Sixty-one percent of the chronic-phase CML patients in this study had failed at least three prior tyrosine kinase inhibitors (TKI).

> ….

> • The most common non-hematologic treatment-related adverse events in all patients in this trial included rash (42%), arthralgia (20%), increased lipase (20%), fatigue (19%) and dry skin (19%), with the majority of these being grades 1 or 2 in severity.

The most common hematologic treatment-related adverse events included thrombocytopenia (34%), neutropenia (14%) and anemia (12%), with thrombocytopenia and neutropenia being primarily grades 3 or 4 in severity.

**PACE Trial MMR Rates in Chronic-Phase CML Patients**

The ongoing pivotal Phase 2 PACE trial enrolled 449 patients with chronic myeloid leukemia (CML) or Philadelphia-positive acute lymphoblastic leukemia (Ph+ ALL), who are resistant or intolerant to dasatinib or nilotinib or who have the T315I mutation.

….

- The most common hematologic treatment-emergent adverse events were thrombocytopenia (42%), neutropenia (24%), and anemia (20%), which were primarily grades 3 or 4 in severity.

- Pancreatitis and pneumonia were the most common non-hematologic treatment-emergent serious adverse events (5% each), followed by abdominal pain (4%), myocardial infarction (3%), congestive heart failure (3%), atrial fibrillation (3%), and pyrexia (3%). The most common hematologic serious adverse events were anemia, febrile neutropenia, and thrombocytopenia (3% each).

66.    On December 11, 2012, one or more of the Individual Defendants caused the Company to issue another press release announcing 12-month data from the PACE trial of Ponatinib, which presented the following safety profile:

*Safety profile (N=449)*

The most common non-hematologic treatment-emergent adverse events across all patients in the PACE trial included rash (in 38% of patients), abdominal pain (38%), headache (35%), dry skin (35%), and constipation (34%), with the majority of these being grades 1 or 2 in severity.

The most common hematologic treatment-emergent adverse events were thrombocytopenia (42%), neutropenia (24%), and anemia (20%), which were primarily grades 3 or 4 in severity.

Pancreatitis and pneumonia were the most common non-hematologic treatment-emergent serious adverse events (5%

each), followed by abdominal pain (4%), myocardial infarction (3%), congestive heart failure (3%), atrial fibrillation (3%), and pyrexia (3%). The most common hematologic serious adverse events were anemia, febrile neutropenia, and thrombocytopenia (3% each).

## Statements Concerning the FDA's Accelerated Approval of Iclusig

67.     On December 14, 2012, one or more of the Individual Defendants caused the Company to issue a press release announcing that the FDA granted accelerated approval of Iclusig for patients with CML and Ph+ ALL resistant or intolerant to prior Tyrosine Kinase Inhibitor Therapy. The December 14, 2012 press release also included the following safety information:

**Important Safety Information**

Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke have occurred in Iclusig-treated patients. Serious arterial thrombosis occurred in 8% of Iclusig-treated patients. Interrupt and consider discontinuation of Iclusig in patients who develop arterial thrombotic events.

Hepatotoxicity, liver failure and death have occurred in Iclusig-treated patients. Monitor hepatic function prior to and during treatment. Interrupt and then reduce or discontinue Iclusig for hepatotoxicity.

68.     On March 1, 2013, one or more of the Individual Defendants caused the Company to file an annual report with the SEC on a Form 10- K for the fourth quarter and year ended December 31, 2012 which was signed by Berger, Fitzgerald, and the Director Defendants (except for Schlesinger). In addition, the Form 10-K contained certifications pursuant to SOX signed by Berger and Fitzgerald, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

69.     The Form 10-K for ARIAD's fiscal year ended December 31, 2012 discussed ARIAD's plans to aggressively and expansively commercialize Ponatinib:

On December 14, 2012, we obtained accelerated approval from the U.S. Food and Drug Administration, or FDA, to sell our first new cancer medicine, Iclusig. Iclusig is a tyrosine kinase inhibitor, or TKI, that is approved in the United States for the treatment of adult patients with chronic, accelerated or blast phase chronic myeloid leukemia, or CML, who are resistant or intolerant to prior TKI therapy, and the treatment of adult patients with Philadelphia chromosome-positive acute lymphoblastic leukemia, or Ph+ ALL, who are resistant or intolerant to prior TKI therapy.

We have commenced sales and marketing of Iclusig, and the medicine is now available for patients in the United States through specialty pharmacies and specialty distributors. We currently charge approximately $115,000, on a wholesale basis, for an annual supply of the recommended dose of Iclusig.

We have also filed for marketing authorization for Iclusig with the European Medicines Authority, or EMA, and we currently anticipate approval in the third quarter of 2013. We will need to obtain pricing and reimbursement approval in certain countries in Europe before it will be widely available for use, which approvals we anticipate obtaining beginning in 2014. We also plan to file for marketing authorization for Iclusig with regulatory authorities in other selected territories around the world, including Switzerland, Canada and Australia in the second half of 2013 and Japan in mid-2014. Each of these regulatory authorities has its own processes and timelines for the review and approval of marketing authorization applications.

We plan to commercialize Iclusig on our own in the United States and, subject to obtaining regulatory approval, in Europe and other selected territories worldwide. During the past year, we have been actively focused on preparing for the commercial launch of Iclusig in the United States, including establishing an experienced and trained sales force and other professional staff necessary for an effective launch, implementing systems and processes to support launch, developing tools and materials to be utilized during the commercialization of Iclusig and other activities, and arranging for Iclusig to be provided to patients through a network of specialty pharmacies and specialty distributors. We have also initiated operations in Europe, with headquarters in Switzerland, in preparation for potential EMA approval of Iclusig. We have hired management and other key personnel in Switzerland who are building our business infrastructure and capabilities in Europe.

70.    The Form 10-K for ARIAD's fiscal year ended December 31, 2012 also included the following statements about Ponatinib and its safety:

The FDA approval of Iclusig was based on results from the pivotal Phase 2 PACE ( **P** onatinib Ph+ **A** LL and **C** ML **E** valuation) trial in patients with CML or Ph+ ALL who were resistant or intolerant to prior TKI therapy, or who had the T315I mutation of BCR-ABL. Iclusig had robust anti-leukemic activity, with 54 percent of chronic-phase CML patients, including 70 percent of patients with the T315I mutation, achieving a major cytogenetic response, or MCyR, which was the primary endpoint of the PACE trial for chronic-phase patients. A MCyR means that 35 percent or less of the cells in a patient's bone marrow test positive for the Philadelphia chromosome. In patients with advanced disease, 52 percent of accelerated-phase CML patients, 31 percent of blast-phase CML patients and 41 percent of Ph+ ALL patients achieved a major hematologic response, or MaHR, to Iclusig. MaHR was the primary endpoint in the trial for patients with advanced disease. A MaHR, as measured through the counting of white blood cells in blood and bone marrow, means that either a complete hematologic response has occurred or there is no evidence of leukemia. The most common non-hematologic adverse reactions reported (greater than or equal to 20 percent) were hypertension, rash, abdominal pain, fatigue, headache, dry skin, constipation, arthralgia, nausea, and pyrexia. Hematologic adverse reactions included thrombocytopenia, anemia, neutropenia, lymphopenia, and leukopenia.

The full prescribing information for Iclusig includes a boxed warning specifying that arterial thrombosis and hepatotoxicity have occurred in some patients during clinical trials of Iclusig. Cardiovascular, cerebrovascular, and peripheral vascular thrombosis, including fatal myocardial infarction and stroke, have occurred in Iclusig-treated patients. Serious arterial thrombosis occurred in 8 percent of Iclusig-treated patients. In addition, hepatotoxicity, liver failure and death have occurred in Iclusig-treated patients.

**While News About Potential Safety Issues With Iclusig Begin Seeping Into the Market, The Individual Defendants Cause ARIAD to Continue to Reassure the Public About Iclusig's Safety and Commercial Marketability**

71.     In late March 2013 – only three months after ARIAD announced accelerated approval of Iclusig, and closely on the heels of the Individual Defendants' representations in ARIAD's Form 10-K about Iclusig's safety and ARIAD's aggressive efforts to expansively commercialize Iclusig – news about potential safety issues with Iclusig began to seep into the market.

72.     On or about March 27, 2013, changes were made to the enrollment criteria for the Ponatinib EPIC study, expanding some existing exclusion criteria, and adding other exclusion criteria.   Before the changes, enrollment restrictions set for the EPIC study excluded newly diagnosed CML patients from the study if they had suffered a heart attack or experienced unstable angina or congestive heart failure within three months prior to enrollment.  The March 27, 2013 changes further restricted enrollment by expanding these exclusions, to exclude newly diagnosed CML patients who had suffered a heart attack, unstable angina, or congestive heart failure within *six* months prior to enrollment.   The March 27, 2013 changes also added new restrictions, excluding from the EPIC study potential patients with: (a) a history of ventricular arrhythmia, (b) a cerebrovascular accident or transient ischemic attack within the last six months, (c) any history of clogged arteries requiring revascularization, and (d) any history of blood clots.

73.     Also on March 27, 2013, "The Street," www.thestreet.com, published an online article entitled "Ariad Pharma Falls on Weak Leukemia Drug Prescriptions," which highlighted concerns voiced by at least one analyst regarding Iclusig's safety and true commercial marketability, but which also included reassurances made by Berger to another analyst regarding Ponatinib's broad commercial marketability:

> CAMBRIDGE, Mass. (TheStreet) -- **Ariad Pharmaceuticals** has been hit with a wave of selling in the past two weeks tied to investor concerns about the commercial launch of the company's leukemia drug Iclusig. The selling has erased all the gains made in the Ariad since the beginning of the year.
>
> For the past two weeks, Iclusig scripts have been soft, up 8% for the week ended March 8 and down 17% for the week ended March 15, according to IMS Health. Say what you will about the reliability and meaningfulness of a week's worth of prescription data, but Wall Street follows this stuff closely. A down week in scripts for a drug like Iclusig -- with high sales expectations already baked into Ariad's $3.4 billion market valuation -- raises alarm bells.

….

Ariad's efforts to position Iclusig as a first or second-line CML treatment -- necessary to capture enough market share to meet sales expectations -- are failing because of the drug's significant side effects, the fund manager believes.

"Iclusig is a dirty drug. Patients get all of the toxicities of the competing CML drugs without any meaningful improvement in efficacy," he said.

FDA approved Iclusig with a black box warning alerting doctors to watch for blood clots that have caused fatal heart attacks and strokes, and liver toxicity including reports of liver failure and death.

Ariad expects to complete enrollment by the end of the year in a study comparing Iclusig to Gleevec in first-line CML patients. The company believes positive results will help convince doctors to use Iclusig with newly diagnosed CML patients. Ariad shorts, including the aforementioned fund manager, believe this study will fail and may even be stopped early because Iclusig's safety and tolerability will be significantly worse than Gleevec.

On Wednesday, BMO Capital Markets analyst Jim Birchenough reiterated his outperform rating on Ariad and defended the company's outlook following a conversation with CEO Harvey Berger. Here's what Birchenough told his clients:

> We had the opportunity to talk with Ariad's CEO Dr. Harvey Berger late yesterday to review recent concerns regarding IMS prescription data for ICLUSIG, breadth of proposed ICLUSIG labeling in the EU, and expectations for ALK/EGFR inhibitor AP26113 in NSCLC. Importantly, while the shares have been under pressure on this week's IMS TRX data, Dr. Berger highlighted good visibility on ICLUSIG daily data to the patient level, confidence in continued launch momentum, and breadth of ICLUSIG use across community and academic centers, by line of therapy and independent of mutation status. Dr. Berger acknowledged that the EU indication for 2nd-line ICLUSIG use after 2nd-generation TKI's was narrower than in the US, but highlighted 40% of front-line EU patients treated with 2nd-generation TKI's. Finally, with additional focus on ALK/EGFR inhibitor AP26113, Dr. Berger

33

> *highlighted activity in brain metastases as key for favorable positioning in ALK+ patients where 50% of XALKORI failures have brain metastases, and importantly confidence in a similarly deliberate process of dose optimization to achieve blood levels that should consistently inhibit EGFR mutations in patients selected for proximal Tarceva failure in the phase 2 expansion study.*

74.   One week later, on April 3, 2013, "The Street "published another online article entitled "Ariad's Leukemia Drug Toxic, Survey Says."   This article discussed a survey purportedly performed by Favus Institutional Research regarding Ponatinib's toxicity, reporting as follows:

> CAMBRIDGE, Mass. (<u>TheStreet</u>) -- The nettlesome issue of toxicity tied to Ariad Pharmaceutical's leukemia drug Iclusig was raised again Wednesday in a small survey of oncologists conducted by Favus Institutional Research.
>
> Ariad shares fell 4.1% on Wednesday to $16.76.
>
> Favus:
>
> > *The more we learn about Iclusig, the less it appears to be a frontline CML drug. As the number of cases of liver toxicity, pancreatitis, abdominal pain, severe acute hypertension, heart attack, stroke, TIA, digital ischemia, and gastrointestinal perforation rise, investors' faith in Iclusig will fall, and so will the price of ARIA shares. Iclusig has a very small role to play in heavily pre-treated CML patients with the T315I mutation (extremely rare); as time goes on, that observation is becoming obvious. Don't be the last to know....*
>
> Favus surveyed 13 oncologists who have treated 77 patients with Iclusig since the FDA approval in December. Thirty-nine of the patients, or just over half, transferred from Ariad's pre-approval, expanded access program (EAP.) Another 10 patients (13%) have already discontinued Iclusig. The doctors surveyed told Favus that Iclusig is being used primarily in the small subgroup of CML patients with the T315I mutation, contradicting Ariad's claims that the drug is being more widely used.

BMO Capital Markets analyst Jim Birchenough came to Ariad's defense in a note critical of Favus' methodology:

Birchenough:

> *"We would remind investors that patients enrolled in the Iclusig expanded access program (EAP) represent the sickest patient population, with a disproportionately high group of patients with blast phase (BP) or accelerated phase (AP) disease, only 40% of patients with chronic phase (CP) disease and at highest risk of imminent death, warranting EAP use of Iclusig ahead of approval. We also believe that the Iclusig EAP selected for patients with T315i mutation and is not representative of the labeled indication or expected broader commercial use. Indeed, expert feedback, and that from ARIA management over the last few days, suggests broad use of Iclusig across lines of therapy and independent of mutation status."*

75.     The next day, April 4, 2013, "The Street "published an online article entitled "Ariad CEO Strikes Back, Insists Leukemia Drug is Fine," which reported on ARIAD's response to the Favus survey:

> **Ariad Pharmaceuticals**(ARIA) CEO Harvey Berger, sounding defiant, even angry at times, convened a marathon conference call Thursday to refute concerns about the safety and early commercial launch of the company's leukemia drug Iclusig.

> Berger took special aim at Ariad critic Favus Institutional Research, calling a negative report on Iclusig released Wednesday, "incomplete and replete with misinformation, innuendo and false conclusions."

> Through the first 12 weeks of its U.S. commercial launch, "more than" 325 chronic myeloid leukemia (CLM) patients are paying for Iclusig treatment, with additional, undisclosed number of patients receiving some free drug, Ariad said.

> The new disclosure led investors and analysts on the call scurrying to their Excel spreadsheets, trying to estimate first quarter sales. Ariad could have made it easy on everyone by simply pre-announcing Iclusig sales but the company chose not to.

35

Analyst consensus for first-quarter Iclusig sales was $4 million prior to Thursday's call, although the "whisper number" based on existing prescription data is more like $5-6 million.

I spoke with one institutional investor with no position in Ariad who now estimates Iclusig sales for the quarter will be $3.5 million to $5 million, depending on the conversion rate of patients from free drug to paid prescriptions.

"If you're really bullish on Iclusig, why not pre-announce first-quarter Iclusig sales?" asks another investor who is short Ariad and isn't covering following Thursday's call. "What I heard on the call was 90 minutes of Harvey babbling and contradicting himself."

On his call, Berger insisted Iclusig is well received by doctors and patients and that concerns about the drug's toxicity were overblown. The rate and type of side effects being reported are not different from what was seen in clinical trials or what's contained in the drug's FDA-approved label, he said.

Iclusig's label includes a black box warning against blood clots causing fatal heart attacks and strokes, and liver toxicity including liver failure and death.

The Favus research note negative on Iclusig published Wednesday refers to a survey of doctors treating CML patients with the drug who are finding it to be more toxic and less tolerable than expected. "Iclusig has a very small role to play in heavily pre-treated CML patients with the T315I mutation (extremely rare); as time goes on, that observation is becoming obvious," the Favus note said.

Ariad insists Iclusig will be used broadly in all types of CML patients. The company is conducting a study comparing Iclusig to **Novartis'**(NVS) Gleevec in newly diagnosed [sic] CML patients.

76.     On May 10, 2013, one or more of the Individual Defendants caused the Company to file a quarterly report with the SEC on a Form 10-Q for the first quarter ended March 31, 2013 which was signed by Berger and Fitzgerald.  In addition, the Form 10-Q contained certifications pursuant to SOX signed by Berger and Fitzgerald, stating that the financial information

contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

77.   In ARIAD's Form 10-Q for the first quarter ended March 31, 2013, one or more the Individual Defendants continued to cause ARIAD to highlight the Company's major initiatives and efforts to expansively commercialize Iclusig:

> On December 14, 2012, we obtained accelerated approval from the U.S. Food and Drug Administration, or FDA, to sell our first new cancer medicine, Iclusig. Iclusig is a tyrosine kinase inhibitor, or TKI, that is approved in the United States for the treatment of adult patients with chronic, accelerated or blast phase chronic myeloid leukemia, or CML, who are resistant or intolerant to prior TKI therapy, and the treatment of adult patients with Philadelphia chromosome-positive acute lymphoblastic leukemia, or Ph+ ALL, who are resistant or intolerant to prior TKI therapy.
>
> We have commenced sales and marketing of Iclusig, and the medicine is now available for patients in the United States through a limited number of specialty pharmacies and specialty distributors. We currently charge approximately $115,000, on a wholesale basis, for an annual supply of the recommended dose of Iclusig.
>
> In the fourth quarter of 2012, we hired an experienced sales force and other professional personnel who, upon approval of Iclusig by the FDA, began to promote Iclusig to healthcare providers and payors throughout the United States. We are also investing in systems, tools and materials necessary to support the effective commercialization of Iclusig. We compete with companies who have existing TKIs on the market, including Novartis AG and Bristol-Myers Squibb Company, which have been approved for the treatment of CML patients for many years. We believe that Iclusig has a competitive commercial profile compared to the existing TKI therapies on the market. Our ability to successfully compete with these other products in the United States will depend on, among other factors, the effectiveness of our commercial strategy for marketing Iclusig and our implementation of that strategy, including pricing and reimbursement strategies, and the acceptance of Iclusig by patients, the medical community and third-party payors.
>
> We have filed for marketing authorization for Iclusig with the European Medicines Authority, or EMA. In March 2013, the EMA's Committee for Human Medicinal Products, or CHMP, adopted a positive opinion on our application for Iclusig for two indications….

We currently anticipate approval in the European Union in the second quarter of 2013. We will need to obtain pricing and reimbursement approval in certain countries in Europe before Iclusig will be widely available for use, which approvals we anticipate obtaining beginning in late 2013. We filed a Marketing Authorization Application for Iclusig in Switzerland in April 2013 and also plan to file for marketing authorization for Iclusig with regulatory authorities in other selected territories around the world, including Canada and Australia in the third quarter of 2013 and Japan in mid 2014. Each of these regulatory authorities has its own processes and timelines for the review and approval of marketing authorization applications.

As in the United States, we plan to commercialize Iclusig on our own, subject to obtaining regulatory approval, in Europe and other selected territories worldwide. In 2012, we initiated operations in Europe, with headquarters in Switzerland, in preparation for potential EMA approval of Iclusig. We have hired management and other key personnel in Switzerland and other selected countries in Europe who are building our business infrastructure and capabilities and actively preparing for the anticipated commercial launch of Iclusig in Europe. We have established early-access programs for Iclusig in Europe, have established the supply chain in key markets and have implemented initial pricing and reimbursement activities.

We are also developing Iclusig for expanded indications in CML and in additional cancer indications. In July 2012, we initiated a randomized Phase 3 clinical trial of ponatinib, referred to as the EPIC (**E**valuation of **P**onatinib versus **I**matinib in **C**hronic Myeloid Leukemia) trial, in adult patients with newly diagnosed CML in the chronic phase. We currently anticipate completion of enrollment in the fourth quarter of 2013, with an interim analysis of the data in mid-2014. In August 2012, we initiated a multi-center Phase 1/2 clinical trial in Japan of Iclusig in Japanese patients with CML who have failed treatment with dasatinib or nilotinib or who have Ph+ ALL and have failed prior treatment with TKIs. This trial is designed to establish the recommended dose for Iclusig and confirm its anti-leukemic activity in Japanese patients. In January 2013, we announced an agreement with Newcastle University, U.K., on behalf of the U.K. National Cancer Research Institute, or NCRI, to collaborate on a multi-center, randomized Phase 3 trial, named SPIRIT 3, to assess the impact of switching patients with CML being treated with a first-line TKI, upon suboptimal response or treatment failure, to Iclusig. We expect that a total of approximately 1,000 patients will be enrolled in this trial, with enrollments beginning in the third quarter of 2013.

We believe that Iclusig has potential applications beyond CML in other blood cancers and solid tumors, such as gastrointestinal stromal tumors,

or GIST, acute myeloid leukemia and certain forms of non-small cell lung cancer, or NSCLC. We plan to initiate additional clinical trials of Iclusig as we continue development of this product candidate.

78.    Nowhere, in ARIAD's Form 10-Q for the first quarter ended March 31, 2013, did any of the Individual Defendants cause ARIAD to disclose the new March 27, 2013 restrictions and heightened exclusion criteria that had been placed on patient enrollment in the EPIC trial.

79.    On June 1, 2013, one or more of the Individual Defendants caused the Company to issue a press release presenting an analysis of the cardiovascular risk profile of patients from the PACE trial. While disclosing that serious arterial thrombotic events can be a complication, the press release attributed such events largely to the pre-treatment history of the affected study patients:

> Serious arterial thrombotic (AT) events can be a complication of BCR-ABL tyrosine kinase inhibitor (TKI) therapy in Ph+ leukemias. In the single-arm, PACE trial, serious AT events, including cardiovascular, cerebrovascular and peripheral vascular events, occurred in 34 of 449 patients (8%). This analysis showed that patients who experienced serious ATs while on study more commonly had a history of pre-existing cardiac disease and a higher prevalence of baseline cardiovascular risk factors prior to enrollment than in those patients who did not experience these events.
>
> ....
>
> Of 34 patients with serious AT events reported in the PACE trial, 21 had cardiovascular events and 14 had cerebrovascular or peripheral vascular events. Pre-existing cardiac disease was present in 15 of 21 patients (71%) who had cardiovascular events and 6 of 14 patients (43%) who had cerebrovascular or peripheral vascular events on study. Further, 30 patients (88%) had at least one pre-existing cardiovascular risk factor, 14 patients (41%) had pre-existing ischemic cardiac disease, and 19 patients (56%) were at least 65 years of age.
>
> "Although uncommon, cardiovascular events have been reported in patients with Ph+ leukemias treated with BCR-ABL TKIs," said H. Jean Khoury, M.D., professor of hematology and medical oncology, and director of the Division of Hematology of the Winship Cancer Institute at Emory University. "Patients in the PACE trial were heavily pretreated

with multiple prior TKIs. This analysis shows that patients who experienced serious arterial thrombotic events generally were older, had a more prolonged duration of leukemia since original diagnosis, had one or more cardiovascular risk factors prior to entry in the trial and had a high prevalence of pre-existing cardiac and ischemic diseases."

.…

**Summary of Characteristics and Clinical Profile of Patients with Serious AT Events**

- Patients with serious AT events had significantly higher incidences of pre-existing diabetes (44% *vs.* 14%) and hypertension (82% *vs.* 51%) than patients who did not experience these events. Almost all patients who had cerebrovascular or peripheral vascular events while on study had hypertension at baseline.

- Differences in demographics, medical history and previous therapy also distinguished the population experiencing serious AT events. History of ischemic cardiac disease (41% *vs.* 10%) and age of at least 65 years (56% *vs.* 33%) were significantly greater in those with serious AT events than in those without. The population also had a significantly longer duration of prior TKI therapy (6.3 *vs.* 4.9 years) and significantly longer duration of prior nilotinib therapy (1.8 *vs.* 1.2 years).

- Patients from the serious AT group were exposed to comparable dose intensity of ponatinib when compared to those without serious AT events. The median time to onset of serious AT events was approximately six months. Blood pressure increased by one or two grades during the trial in 59% of patients who experienced serious AT events.

- Patients were managed with dose interruption and dose modification comparably in patients with and without serious AT events. In more than one-third of patients with serious ATs, there was no modification to ponatinib dosing. Discontinuation rates among patients with serious AT events were comparable to the overall discontinuation rates for the study.

- Anti-leukemic response to Iclusig was similar in patients with serious AT events as compared to those without (chronic-phase CML, 73% *vs.* 52%). Sixteen of 22 patients with serious AT events (73 %) achieved major cytogenetic response, and nine of 22 (41 %) had a major molecular response.

"This analysis is important as we consider the patient population now receiving Iclusig after becoming resistant or intolerant to prior TKI therapy and determine how to best treat patients with prior cardiovascular history or risk factors," said Frank G. Haluska, M.D., Ph.D., senior vice president, clinical research and development and chief medical officer of ARIAD. "This analysis also showed that these patients can be managed with standard dose adjustments while maintaining clinical benefit from treatment. In Philadelphia-positive leukemia patients with predisposing factors or co-morbidities, physicians should pay close attention to management of hypertension and diabetes."

80.     On or about July 25, 2013, a material, downward adjustment, from 45 mg (the FDA approved dose) to 30 mg, was made in the dosage of Ponatinib being administered in another ongoing study – a single-arm, frontline CML study being conducted by the M.D. Anderson Cancer Center known as the "Cortes" study.

81.     Soon thereafter, on or about August 7, 2013, one or more of the Individual Defendants caused ARIAD to host a conference call to discuss ARIAD's earnings and development progress for the second quarter ended June 30, 2013.  During that call, Berger addressed the dosage adjustment in the "Cortes" study, dismissing any notion that this downward adjustment was because of any safety concerns surrounding Ponatinib or the drug's unacceptable toxicity.  A September 13, 2013 article published by "The Street," entitled: "Biotech Stocks Mailbag:  Ariad, NewLink, Zogenix, 5 Falling Stocks for Rest of 13," reported Berger's comments during the August 7, 2013 conference call on this issue as follows:

"... [T]hey started at 45 milligrams as in the EPIC trial and completely enrolled a cohort at 45, and then wanted to study an additional group of patients at 30, so that they have data at both of the -- starting at each of those dose levels. It -- what happened was the 45-milligram cohort where 45-milligram patients enrolled quickly and they got through the enrollment of those patients, and now we're enrolling 30-milligram patients so they can do some comparison of the 2 groups."

82.     On August 9, 2013, one or more of the Individual Defendants caused the Company to file a quarterly report with the SEC on a Form 10-Q for the second quarter ended June 30, 2013 which was signed by Berger and Fitzgerald. In addition, the Form 10-Q contained certifications pursuant to SOX signed by Berger and Fitzgerald, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83.     In ARIAD's Form 10-Q for the second quarter ended June 30, 2013, one or more of the Individual Defendants continued to cause ARIAD to highlight the Company's major initiatives and efforts to expansively commercialize Iclusig:

> On December 14, 2012, we obtained accelerated approval from the U.S. Food and Drug Administration, or FDA, to sell our first new cancer medicine, Iclusig. Iclusig is a tyrosine kinase inhibitor, or TKI, that is approved in the United States for the treatment of adult patients with chronic, accelerated or blast phase chronic myeloid leukemia, or CML, who are resistant or intolerant to prior TKI therapy, and the treatment of adult patients with Philadelphia chromosome-positive acute lymphoblastic leukemia, or Ph+ ALL, who are resistant or intolerant to prior TKI therapy.
>
> We commenced sales and marketing of Iclusig in the first quarter of 2013, and the medicine is available for patients in the United States through a limited number of specialty pharmacies and specialty distributors. In the United States, we currently charge approximately $115,000, on a wholesale basis, for an annual supply of the recommended dose of Iclusig.
>
> On July 2, 2013, we announced the granting of our marketing authorization for Iclusig by the European Commission, or EC, as an orphan medicinal product for two indications….
>
> We have begun selling Iclusig in certain countries in Europe in the third quarter of 2013. We are seeking pricing and reimbursement approval in various countries in Europe to ensure that Iclusig will be widely available for use. We anticipate obtaining the first of these pricing approvals commencing in the second half of 2013. In addition, we have filed marketing authorization applications for Iclusig in Switzerland, Canada and Australia and plan to file for marketing authorization for Iclusig with regulatory authorities in other selected territories around the world,

including Japan in 2014. Each of these regulatory authorities has its own processes and timelines for the review and approval of marketing authorization applications.

We compete with companies who have existing TKIs on the market, including Novartis AG, Bristol-Myers Squibb Company and Pfizer, Inc., which are approved for the treatment of CML patients. We believe that Iclusig has a competitive commercial profile compared to the existing TKI therapies on the market. Our ability to successfully compete with these other products in the United States and Europe will depend on, among other factors, the effectiveness of our commercial strategy for marketing Iclusig and our implementation of that strategy, including pricing and reimbursement strategies, and the acceptance of Iclusig by patients, the medical community and third-party payors.

In the fourth quarter of 2012, we hired an experienced sales force and other professional personnel who, upon approval of Iclusig by the FDA, began to promote Iclusig to healthcare providers and payors throughout the United States. As in the United States, we have begun to commercialize Iclusig on our own in Europe and other selected territories worldwide. In 2012, we established operations in Europe with headquarters in Switzerland in preparation for the European approval of Iclusig. We hired management and other key personnel in Switzerland and other selected countries in Europe who are building our business infrastructure and capabilities and are now selling Iclusig in certain countries. We have established early-access programs for Iclusig in Europe, established the supply chain in key markets and implemented initial pricing and reimbursement activities in various countries. We are also investing in systems, tools and materials necessary to support the effective global commercialization of Iclusig.

We are also developing Iclusig for expanded indications in CML and in additional cancer indications. In July 2012, we initiated a randomized Phase 3 clinical trial of ponatinib, referred to as the EPIC (**E**valuation of **P**onatinib versus **I**matinib in **C**hronic Myeloid Leukemia) trial, in adult patients with newly diagnosed CML in the chronic phase. We currently anticipate completion of enrollment in this trial in the fourth quarter of 2013, with an interim analysis of the data in the third quarter of 2014. In August 2012, we initiated a multi-center Phase 1/2 clinical trial in Japan of Iclusig in Japanese patients with CML who have failed treatment with dasatinib or nilotinib or who have Ph+ ALL and have failed prior treatment with TKIs. This trial is designed to establish the recommended dose for Iclusig and confirm its anti-leukemic activity in Japanese patients. The trial is now fully enrolled….

84.     Again, nowhere in ARIAD's Form 10-Q for the second quarter ended June 30, 2013, did any of the Individual Defendants cause ARIAD to disclose the new March 27, 2013 restrictions that had been placed on patient enrollment in the EPIC trial.  Nor did the Individual Defendants cause ARIAD to disclose or discuss the July 25, 2013 adjustment of Ponatinib's dosage downward from 45 mg to 30 mg in the "Cortes" study.

85.     As discussed below, however, the changes to the EPIC trial and "Cortes" study, as well as the news questioning Iclusig's safety and true commercial marketability, would soon prove prophetic.  And the statements and reassurances that one or more of the Individual Defendants caused ARIAD to make regarding Iclusig's safety and broad commercial marketability would also soon be exposed as false or materially misleading.

## INSIDER TRADING

86.     Starting in February 2012 and, in some cases up to September 2013 – one month before the bottom would drop out from under Iclusig and ARIAD's stock price –Individual Defendants Berger, Clackson, Fitzgerald, and Haluska collectively unloaded over 1.2 million shares of their ARIAD stock on the market, at average prices ranging from $14.51 per share (a premium of 660% over the stock's closing price on October 31, 2013) to as high as $24.17 per share (a premium of 1099% over the stock's closing price on October 31, 2013).  Collectively, these sales netted these Individual Defendants proceeds of over $22.3 million.

87.     As demonstrated below, many of these highly unusual trades were made when ARIAD's stock traded at or near Relevant Period highs, and nearly all of the trades were made in two short, suspicious trading windows:

- From February 2012 through October 2012, when the Individual Defendants were aggressively touting the results of the PACE Phase II trial and Iclusig's

impending commercial launch (during which time the price of ARIAD stock more than doubled and reach its all-time high); and

- From March 2013 through September 2013 (just one month before the collapse of ARIAD's stock price), when the Individual Defendants were touting sales of Iclusig and denying reports of the drug's safety issues.

### Defendant Berger

88.     Defendant Berger, as the CEO and Chairman of the Board of ARIAD throughout the Relevant Period, had direct, daily access to the materially adverse information described above but hidden from shareholders regarding the Company's sole drug, Iclusig.

89.     While in possession of this nonpublic information, Berger sold 632,657 shares of ARIAD stock at average prices ranging from $18.00 per share to as high as $22.05 per share, for a net total of $12,231,286.  These stock sales were suspicious and highly unusual for a number of reasons:

    i.    Timing: All of Berger's sales were made during a short five-month window between March 12, 2013 (just days after the Individual Defendants first touted sales of Iclusig) and August 13, 2013 (less than two months before ARIAD's stock fell 87%).  During this time, ARIAD's stock traded at or near all-time highs.

    ii.   Amount: By the time of his final trade, Defendant Berger had sold 100% of his common stock holdings in ARIAD.

    iii.  Prior Trading History: Prior to March 2013, Defendant Berger had never sold a share of ARIAD stock.

**Defendant Clackson**

90.     Defendant Clackson, as ARIAD's CSO and President of Research & Development, had direct and daily access to the materially adverse information described above but hidden from investors about ARIAD's sole product – Iclusig.

91.     While in possession of this nonpublic information, Clackson sold 366,839 shares of ARIAD stock, at average prices ranging from $14.86 per share to as high as $22.00 per share, for a net total of $5,940,472.  These sales were highly suspicious for a number of reasons:

i.      Timing: Clackson's trades were executed in two very short, six month, and suspicious trading windows.  From February 14, 2012 through August 15, 2012 (when Clackson and others were touting the impending commercial marketability of Iclusig and ARIAD's stock price nearly doubled), Clackson sold 302,218 shares of stock.  Then, after not selling any shares for the next six months, Clackson sold another 64,621 shares from March 4, 2013 (just days after the Individual Defendants announced the first sales of Iclusig) and September 6, 2013 (just one month before the collapse of ARIAD's stock price).

ii.     Prior Trading History: Prior to February 2012, Clackson had never sold a share of ARIAD common stock.

**Defendant Fitzgerald**

92.     Defendant Fitzgerald, as ARIAD's CFO during the Relevant Period, had direct and daily access to the materially adverse information described above but hidden from shareholders about ARIAD's sole product – Iclusig.

93.     With this nonpublic information, Fitzgerald sold 182,466 shares of ARIAD stock, at average prices ranging from $15.00 per share to as high as $24.17 per share, for a net total of $3,235,334.  These sales were highly unusual and suspicious for a number of reasons:

    i.    <u>Timing:</u> Fitzgerald's trades were executed in two very compressed, suspicious trading windows.  From March 20, 2012 through October 1, 2012 (a five month period during which the Individual Defendants were touting the impending commercial marketability of Iclusig and ARIAD's stock price nearly doubled), Fitzgerald sold 139,333 shares of stock. Then, Fitzgerald sold another 43,133 shares during a compressed three month window from January 2, 2013 (just two weeks after the FDA's accelerated acceptance of Iclusig) to April 2, 2013 (just one month after the announcement of the first sales of Iclusig).

    ii.    <u>Prior Trading History</u>: Prior to March 2012, Fitzgerald had never sold a share of ARIAD common stock.

### Defendant Haluska

94.     Defendant Haluska, as ARIAD's Chief Medical Officer, and Senior Vice President of Clinical Research & Development, and direct, daily access to the materially adverse information described above but hidden from shareholders about ARIAD's sole product – Iclusig.

95.     With this nonpublic information, Haluska sold 53,950 shares of ARIAD stock, at average prices ranging from $14.51 per share to as high as $19.79 per share, for a net total of $896,349.  These sales were highly suspicious for a number of reasons:

i. <u>Timing</u>: Haluska's trades were executed in two very compressed, suspicious trading windows.  During a three month window from February 21, 2012 through May 2, 2012 (when the Individual Defendants were touting the impending commercial marketability of Iclusig), Haluska sold 36,057 shares of stock.  Then, after not selling any shares for the next ten months, Haluska sold another 17,533 shares during a four month window from March 22, 2013 (just days after the Individual Defendants announced the first sales of Iclusig) to July 18, 2013 (less than three months before the collapse of ARIAD's stock price).

ii. <u>Prior Trading History</u>: Prior to February 2012, Haluska had never sold a share of ARIAD stock.

## THE TRUTH IS REVEALED

96.    On October 9, 2013, one or more of the Individual Defendants caused the Company to publish a press release announcing significant changes in the clinical development program of Iclusig, which also disclosed for the first time significant, adverse information regarding the results of the PACE trial. Specifically, the Company disclosed that serious arterial thrombosis occurred in 11.8% of Iclusig-treated patients, and that 6.2% of the patients had cerebrovascular events:

> ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced results of its review of updated clinical data from the pivotal PACE trial of Iclusig$^{®}$ (ponatinib) and actions that it is taking following consultations with the U.S. Food and Drug Administration (FDA).
>
> • With a median follow up of 24 months, serious arterial thrombosis occurred in 11.8% of Iclusig-treated patients: cardiovascular events 6.2%, cerebrovascular events 4.0% and peripheral vascular events 3.6% (some patients had more than one type of event). This compares to 8.0% after 11 months of

follow up reflected in the current U.S. prescribing information.

- At 24 months, serious venous occlusion occurred in 2.9% of Iclusig-treated patients, compared to 2.2% in the current U.S. prescribing information.

- The incidence rate of the arterial thrombotic events when normalized to duration of treatment exposure has not increased (10.0 events/100 patient-years in the original analysis and 9.6 events/100 patient-years in the current analysis).

- Non-serious and serious arterial and venous adverse events combined occurred in approximately 20% of Iclusig-treated patients.

The Company is implementing the following actions in its Iclusig clinical development program:

- Patient enrollment in all clinical studies of Iclusig is being paused, and subject to agreement with the FDA, will be resumed with anticipated changes in dose and other modifications. In concert with this action, the FDA placed a partial clinical hold on all new patient enrollment in clinical trials of Iclusig.

- Patients who are currently receiving Iclusig in clinical trials will continue on therapy. Reductions in Iclusig dose from 45 mg daily will be implemented on a trial-by-trial basis for patients whose Iclusig treatment is ongoing.

- The dose of Iclusig in patients who are currently enrolled in the EPIC trial will be reduced to 30 mg daily unless they have achieved a major molecular response or reach one in the future, in which case the dose will be further reduced to 15 mg daily. The Data Monitoring Committee of the EPIC trial has endorsed these changes.

- The eligibility criteria for Iclusig clinical trials will be modified to exclude patients who have experienced prior arterial thrombosis resulting in heart attack or stroke….

97.     On this news, ARIAD shares declined $11.31 per share, or nearly 66%, from the previous day's close, to close at $5.83 per share on October 9, 2013.

98.   Two days later, on October 11, 2013, the FDA published a "Safety Announcement," entitled "FDA Drug Safety Communication:  FDA investigating leukemia drug Iclusig (ponatinib) after increased reports of serious blood clots in arteries and veins."   The Safety Announcement stated:

> The U.S. Food and Drug Administration (FDA) is investigating an increasing frequency of reports of serious and life-threatening blood clots and severe narrowing of blood vessels (arteries and veins) of patients taking the leukemia chemotherapy drug Iclusig (ponatinib).
>
> Health care professionals should consider for each patient, whether the benefits of Iclusig treatment are likely to exceed the risks of treatment.
>
> Patients taking Iclusig should seek immediate medical attention if they experience symptoms suggesting a heart attack such as chest pain or pressure, pain in their arms, back, neck or jaw, or shortness of breath; or symptoms of a stroke such as numbness or weakness on one side of the body, trouble talking, severe headache, or dizziness.
>
> Iclusig is a prescription medicine used to treat adults diagnosed with chronic phase, accelerated phase, or blast phase chronic myeloid leukemia (CML) or Philadelphia chromosome-positive (Ph+) acute lymphoblastic leukemia (ALL), who are no longer benefiting from previous treatment or who did not tolerate other treatment.
>
> At the time of Iclusig's approval in December 2012, the drug label contained information about the risks of blood clots in the *Boxed Warning* and *Warnings and Precautions* sections. In clinical trials conducted before approval, serious arterial blood clots occurred in 8 percent of Iclusig-treated patients, and blood clots in the veins occurred in 3 percent of Iclusig-treated patients. In the most recent clinical trial data submitted by the manufacturer to FDA, at least 20 percent of all participants treated with Iclusig have developed blood clots or narrowing of blood vessels.
>
> Data from clinical trials and postmarket adverse event reports show that serious adverse events have occurred in patients treated with Iclusig, including heart attacks resulting in death, worsening coronary artery disease, stroke, narrowing of large arteries of the brain, severe narrowing of blood vessels in the extremities, and the need for urgent surgical procedures to restore blood flow. Other problems occurring with the drug's use include congestive heart failure (CHF) and loss of blood flow to extremities resulting in tissue death requiring amputation. Newly identified serious adverse reactions have also been reported involving the

eyes, including decreased vision and clots in blood vessels of the eye. These adverse events were seen in all age groups treated and in those with and without cardiovascular risk factors.

FDA is providing this information to patients and health care professionals while it continues its investigation. We are actively working to further evaluate these adverse events and will notify the public when more information is available.

We urge health care professionals and patients to report side effects involving Iclusig to the FDA MedWatch program, using the information in the "Contact FDA" box at the bottom of this page.

99.    On this news the price of ARIAD common stock declined another $1.15 per share to close at $4.26, down 21.3% from the previous day's close, and down 27% from the closing price per share on October 9, 2013 – the date that ARIAD first admitted serious safety problems with Iclusig.

100.    Then, one week later, on October 18, 2013, one or more of the Individual Defendants caused ARIAD to issue a press release announcing that ARIAD was ceasing enrollment in its Phase III EPIC study, again citing the significant safety concerns first disclosed on October 9, 2013:

CAMBRIDGE, Mass.--(BUSINESS WIRE)--Oct. 18, 2013-- ARIAD Pharmaceuticals, Inc. (NASDAQ:ARIA) today announced that it is discontinuing the Phase 3 **EPIC** (**E**valuation of **P**onatinib versus **I**matinib in **C**hronic Myeloid Leukemia) trial of Iclusig[®] (ponatinib) in patients with newly diagnosed chronic myeloid leukemia. ARIAD and the U.S. Food and Drug Administration mutually agreed that the trial should be terminated because arterial thrombotic events were observed in patients treated with Iclusig. This decision was made in the interest of patient safety based on a recent assessment of data in the clinical trial.

"Our decision to stop the EPIC trial at this time is based on our current evaluation of the safety data in the trial since it was placed on partial clinical hold last week," stated Timothy P. Clackson, Ph.D., president of research and development and chief scientific officer at ARIAD. "We believe that this is in the best interests of patient safety and the overall development of Iclusig."

51

Patients in the EPIC trial are being removed from treatment and will be transferred to the care of their physician. ARIAD announced in early September that fifty percent of patients, or approximately 264 patients, had been enrolled in the EPIC trial by that time. Final enrollment is 307 patients.

….

Iclusig is commercially available in the U.S. and EU for patients with resistant or intolerant CML and Philadelphia-chromosome positive acute lymphoblastic leukemia. ARIAD continues to work with health authorities to make appropriate changes to the Iclusig product labeling to reflect the recently announced safety findings from the pivotal PACE trial that was the basis of its marketing approvals.

101.    On this news, ARIAD shares declined another $1.84 per share from the previous day's close, to close at $2.67 per share on October 18, 2013, a one-day decline of 40.67%.

102.    Less than two weeks later, on October 31, 2013, one or more of the Individual Defendants caused ARIAD to announce that ARIAD was "temporarily" withdrawing Iclusig from the United States market, purportedly as "requested" by the FDA:

CAMBRIDGE, Mass.--(BUSINESS WIRE)--Oct. 31, 2013-- ARIAD Pharmaceuticals, Inc. (NASDAQ:ARIA) today announced that it is temporarily suspending the marketing and commercial distribution of Iclusig® (ponatinib), a treatment for patients with resistant or intolerant chronic myeloid leukemia (CML) and Philadelphia-chromosome positive acute lymphoblastic leukemia (Ph+ ALL), in the United States, while it continues to negotiate updates to the U.S. prescribing information for Iclusig and implementation of a risk mitigation strategy.

The Company's actions have been taken in response to a request by the U.S. Food and Drug Administration (FDA) yesterday afternoon. ARIAD believes that Iclusig is an important medicine for patients with resistant or intolerant Philadelphia-positive leukemias and is actively working with the FDA on actions to achieve the resumption of marketing of Iclusig.

103.    On this news, ARIAD shares declined $1.76 per share from the previous day's close, to close at $2.20 per share on October 31, 2013, a one-day decline of 44.4%.  In total, from

October 8, 2013 to October 31, 2013, ARIAD's shares declined an astounding 87.2%, shedding well over $2.5 billion of ARIAD's market capitalization in the process.

104.     The true facts, which were known or recklessly disregarded by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

    a)  Iclusig caused serious arterial thrombosis in far more patients than originally disclosed;

    b)  As a result, there was no reasonable basis to conclude that the drug would become commercially marketable; and

    c)  As a result, the statements made by the Individual Defendants concerning the safety and commercial marketability of Iclusig were materially misleading.

105.     As a result of the Individual Defendants' materially misleading statements, failure to maintain adequate internal controls, and failure to discharge their fiduciary duties to ARIAD and its shareholders, ARIAD stock traded at inflated levels during the Relevant Period. However, after the above revelations seeped into the market, the price of ARIAD stock was hammered by massive sales, sending it down 87.2% over a 10-day period of extremely heavy trading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS
### Fiduciary Duties

106.     By reason of their positions as officers, directors, and/or fiduciaries of ARIAD and because of their ability to control the business and corporate affairs of ARIAD, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ARIAD in a fair, just, honest, and equitable manner.  The Individual

Defendants were and are required to act in furtherance of the best interests of ARIAD and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

107.    Each director and officer of the Company owes to ARIAD and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

108.    In addition to their duties as members of the Board, the members of the Audit Committee owed specific duties to ARIAD under the Audit Committee's Charter, including the duties to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over SEC and financial reporting.

109.    The Audit Committee Charter of the Board's Audit Committee(effective June 20, 2013), which is available on ARIAD's public web site, states that the Audit Committee "is appointed by the Board to assist the Board in fulfilling its oversight responsibilities."   Further, the Company's Audit Committee Charter states, "[t]he Audit Committee's responsibility is oversight.   Management of the Corporation has the responsibility for the Corporation's financial

statements as well as the Corporation's financial reporting processes, accounting principles, and system of internal control."

110.    Among the "primary duties and responsibilities" of the Audit Committee delineated in the Audit Committee Charter, include the duties and responsibilities to:

- Oversee the reliability and integrity of the Corporation's financial statements, accounting and reporting practices, and financial statement audits and reviews;

- Oversee the Corporation's systems of disclosure controls and procedures and internal control over financial reporting;
  … [and]

- Oversee the Corporation's compliance with applicable laws, regulations and corporate policies, including the Corporations Code of Conduct and Ethics.

111.    Also, the Audit Committee Charter states, "[c]onsistent with these functions, the Audit Committee should encourage continuous improvement of, and should foster adherence to, the Corporation's policies, procedures and practices at all levels."

112.    Further defining the Audit Committee's "recurring duties and responsibilities," the Audit Committee Charter identifies (among others) the duties to:

- Review with management … the Corporation's annual financial statements, and the results of the annual audit thereof, to be included in the Corporation's Annual Report on Form 10-K (the Form 10-K) and the Corporation's disclosures in the Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section, prior to the release of earnings and filing of the Form 10-K,…;

- Review with management … the Corporation's quarterly financial statements to be included in the Corporation's Quarterly Reports on Form 10-Q (the Form 10-Q), including the Corporation's disclosures in the MD&A section, prior to the release of earnings and the filing of the Form 10-Q,…;

- Review with management … any significant judgments made in management's preparation of the financial statements…;

- Review and discuss the Corporation's earnings press releases, as appropriate, prior to their issuance…;

- In consultation with the Corporation's management …, consider the integrity of the Corporation's financial reporting processes and controls.  Discuss significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures...;

- Review with management … the programs in place to evaluate the adequacy and effectiveness of the Corporation's systems of disclosure controls and procedures …, and internal control over financial reporting…;

- Approve, oversee and periodically review and update, as needed, the Corporation's Code of Conduct and Ethics and the Corporation's systems to monitor compliance with and enforce this code…;

- Review and investigate, as appropriate, any matter brought to the attention of the Audit Committee within the scope of its duties, including … any legal or regulatory matter that could have a significant impact on the Corporation's financial statements or disclosures in public filings; and

- Report its activities to the Board through its Chair on a regular basis.

113.    Upon information and belief, throughout the Relevant Period, the Company maintained an Audit Committee Charter (or charters) that was (or were) materially and substantially the same in substance as the Company's current Audit Committee Charter described herein.

## Nominating and Corporate Governance Committee Duties

114.    The "Nominating and Corporate Governance Committee Charter"(effective June 20, 2013),which is available on the Company's public web site, identifies a primary "purpose" of the Nominating and Corporate Governance Committee as "to assist the Board in assuring sound corporate governance practices."

115.     Consistent with this purpose, among the "responsibilities and duties" of committee members identified in the Nominating and Corporate Governance Committee Charter, include (in relevant part) the duties and responsibilities to:

- Evaluate periodically the size, composition, organization and governance of the Board and its committees, and make recommendations to the Board for approval;

- Review the Corporation's Corporate Governance Guidelines annually and recommend any proposed changes to the Board for approval;

- Annually review and make recommendations to the Board regarding Board committee member qualifications, Board committee member appointments and removal, and the selection of Board committee chairs;

- Administer an annual Board performance evaluation process, including, as deemed appropriate, conducting surveys of director observations, suggestions and preferences; [and]

- Report its activities to the Board through its Chair on a regular basis.

116.     The Company's Corporate Governance Guidelines(effective June 20, 2013), also available on the Company's public web site, state: "The Board of Directors (the 'Board') believes that a strong system of corporate governance is critical to creating sustainable long-term shareholder value."

117.     The Corporate Governance Guidelines further provide (in relevant part):

The responsibilities of the Board include:

- providing general oversight of the Company's business,

….

- reviewing and approving major corporate initiatives,

- providing oversight of risk and crisis management, legal and ethical conduct,

…. [and]

- evaluating the processes and performance of the Board and its committees.

118.    Further, the Corporate Governance Guidelines reaffirm, "[t]he Nominating and Corporate Governance Committee of the Board … is responsible for the development and oversight of our corporate governance policies and practices….  As part of its responsibilities, the Committee conducts an annual review of our Corporate Governance Guidelines and recommends to the Board any revisions that the Committee feels are warranted in light of the continuing business of the Company."

119.    Regarding "Committees of the Board of Directors," the Corporate Governance Guidelines state (in relevant part): "Our Board establishes committees from time to time to facilitate and assist in the execution of its responsibilities.  These committees shall generally address issues that, because of their complexity and technical nature, level of detail and time requirements or because of applicable corporate governance principles should be addressed by committees rather than the Board."

120.    Upon information and belief, throughout the Relevant Period, the Company maintained a Nominating and Corporate Governance Committee Charter (or charters) that was (or were) materially and substantially the same in substance as the Company's current Nominating and Corporate Governance Committee Charter described herein.

121.    Further, upon information and belief, throughout the Relevant Period, the Company maintained Corporate Governance Guidelines that were materially and substantially the same in substance as the Company's current Corporate Governance Guidelines described herein.

## CONTROL, ACCESS, AND AUTHORITY

122.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of ARIAD, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ARIAD.

123.   Because of their advisory, executive, managerial, and directorial positions with ARIAD, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of ARIAD.

124.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ARIAD, and was at all times acting within the course and scope of such agency.

## REASONABLE AND PRUDENT SUPERVISION

125.   To discharge their duties, the officers and directors of ARIAD were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of ARIAD were required to, among other things:

(a)       refrain from acting upon material inside corporate information to benefit themselves;

(b)       ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)       conduct the affairs of the Company in an efficient, business-like manner

59

so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)       properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)       remain informed as to how ARIAD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)       ensure that ARIAD was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

126.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to ARIAD and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of ARIAD, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ARIAD, the absence of good faith on their part, and a reckless disregard of their duties to ARIAD and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to ARIAD.

127.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that Iclusig was a safe

product with broad commercial marketability. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of the federal securities laws. As a result, ARIAD has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' and Company's wrongdoing.

## CONSPIRING, AIDING AND ABETTING, AND CONCERTED ACTION

128.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

129.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that misled shareholders about the accuracy of the Company's statements that were made in public filings with the SEC, press releases, and at major investor conferences and presentations concerning Iclusig's purported safety and broad commercial marketability. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

130.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

131.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

132.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO ARIAD

133.    As a result of the Individual Defendants' wrongful conduct, ARIAD disseminated false and misleading statements.  The improper statements have devastated ARIAD's credibility. Additionally, ARIAD is now the subject of a securities fraud class action lawsuit. The Company will face substantial costs in connection with an investigation and the lawsuit.

134.    As a direct and proximate result of the Individual Defendants' actions as alleged above, ARIAD's market capitalization has been substantially damaged.

135.    Further, as a direct and proximate result of the Individual Defendants' conduct, ARIAD has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

   a.   costs incurred in investigating and defending ARIAD and certain officers in a class action lawsuit, plus potentially millions or billions of dollars in settlement or to satisfy an adverse judgment;

b. costs incurred from compensation and benefits paid to the Individual Defendants, which compensation, at least with respect to the officers, was based at least in part on ARIAD's artificially-inflated stock price;

c. costs incurred from the misappropriation of Company information by the Individual Defendants for the purposes of selling ARIAD common stock at artificially inflated prices; and

d. costs incurred from the loss of the Company's customers' confidence in ARIAD's products and services.

136. Moreover, these actions have irreparably damaged ARIAD's corporate image and goodwill. For at least the foreseeable future, ARIAD will suffer from a "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ARIAD's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

137. Plaintiff brings this action derivatively in the right and for the benefit of ARIAD to redress injuries suffered, and to be suffered, by ARIAD as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as aiding and abetting thereof. ARIAD is named as a nominal defendant solely in a derivative capacity.

138. Plaintiff will adequately and fairly represent ARIAD's interests in enforcing and prosecuting its rights.

139. Plaintiff was a shareholder of ARIAD common stock during a substantial period of the time of the wrongdoing of which Plaintiff complains and has been continuously since.

140.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

141.    The Board of ARIAD currently consists of the following eight Director Defendants: Berger, LaMarche, Lavidas, Radaelli, Riedel, Schlesinger, Whelan, and Wilson.

### The Director Defendants Face a Substantial Likelihood of Liability

142.    Director Defendants Berger, LaMarche, Lavidas, Radaelli, Riedel, Schlesinger, Whelan, and Wilson face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the Relevant Period (or in the case of Schlesinger, for part of the Relevant Period), and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements and presentations on behalf of the Company concerning Iclusig –the Company's key and only commercially marketed product – were true and not materially misleading.  Moreover, these Individual Defendants, as directors (and, in some cases, also as Audit Committee members and/or Nominating and Corporate Governance Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's and Nominating and Corporate Governance Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

143.    Further, the Director Defendants failed to discharge their duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's and Nominating and Corporate Governance Committee's duties were being discharged in good faith and with the required diligence and due care.   This authorization of false and/or misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and/or failure to take necessary and appropriate steps to ensure that the Audit Committee's and Nominating and Corporate Governance Committee's duties were being discharged in good faith and with the required diligence, constitutes a breach of fiduciary duty, for which the Director Defendants face a substantial likelihood of liability.   If the Director Defendants were to bring a suit on behalf of ARIAD to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.   This is something they will not do.  For this reason demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

144.    Defendants LaMarche, Radaelli, Whelan, Riedel, and Wilson, as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, and for overseeing ARIAD's internal controls over financial reporting.   Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press

releases and earnings guidance. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

## Demand is Futile as to the Nominating and Corporate Governance Committee Defendants

145. Defendants LaMarche, Lavidas, Radaelli, and Wilson, as Nominating and Corporate Governance Committee members, were responsible for, among other responsibilities, (a) developing and overseeing corporate governance policies and practices; (b) evaluating periodically the size, composition, organization and governance of the Board and its committees and making recommendations to the Board for approval; (c) reviewing the Company's Corporate Governance Guidelines annually and recommending any proposed changes to the Board for approval; and (d) annually reviewing and making recommendations to the Board regarding Board committee member qualifications, Board committee member appointments and removal, and the selection of Board committee chairs. Further, the Corporate Governance Guidelines reaffirm, "[t]he Nominating and Corporate Governance Committee of the Board … is responsible for the development and oversight of our corporate governance policies and practices."

146. Despite their aforementioned duties as members of the Nominating and Corporate Governance Committee, Defendants LaMarche, Lavidas, Radaelli, and Wilson failed to exercise due diligence and reasonable care in discharging their duties by developing and overseeing adequate corporate governance policies or procedures designed to review and prevent the dissemination of press releases, SEC filings, or other Company publications or presentations containing false or materially misleading statements concerning the purported safety and commercial marketability of Iclusig (such as, without limitation, establishing a scientific

advisory committee or equivalent committee and appointing qualified members to such committee who have the requisite skills and expertise to, and who are tasked with the specific responsibility to, meaningfully vet scientific claims and statements about the Company's products or product prospects, including statements about safety and commercial marketability or viability).Accordingly, the Nominating and Corporate Governance Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Nominating and Corporate Governance Committee Defendants therefore is futile.

## Demand is Futile as to Defendant Berger

147.   In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Defendant Berger because Berger is not an independent director.  Moreover, from March 12, 2013 through August 14, 2013, Berger sold 632,657 shares of ARIAD stock, at average prices ranging from $18.00 per share to as high as $22.05 per share, for a net total of $12,231,286, while during this same period, Berger made, or caused others to make, false and misleading statements about Iclusig's purported safety and broad commercial marketability that caused the Company's stock to remain at grossly artificially inflated prices.  This, in turn, allowed Berger to dump hundreds of thousands of shares of ARIAD stock on the investing public, allowing Berger to sell these shares at premiums ranging from818% to 1002% over the October 31, 2013, $2.20 per share closing price of ARIAD stock, netting Berger over $12 million. Accordingly, for these additional reasons, Berger faces a sufficiently substantial likelihood of liability for breach of his fiduciary duties of loyalty and good faith.  Any demand upon Berger therefore is futile.

148.     Defendant Berger also cannot disinterestedly consider a demand to bring suit against himself because Berger is a named defendant in at least two related securities fraud class actions alleging that he made many of the same misstatements described above in violation of the federal securities laws.   Thus, if Berger were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the related securities actions, and would expose himself to liability in those actions.   This he will not do.

149.     Demand is futile for the additional reason that Berger is an employee of the Company who derives substantially all of his income from his employment with ARIAD.   As such, he cannot independently consider any demand to sue himself for breaching his fiduciary duties to ARIAD, because that would expose him to liability and threaten his livelihood.

### Demand is Futile as to All Director Defendants for Additional Reasons

150.     If ARIAD's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this Complaint by Directors &Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.   However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by ARIAD against the Individual Defendants, known as the "insured versus insured exclusion."   As a result, if the Director Defendants were to sue themselves or certain of the officers of ARIAD, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.   Therefore, the Director

Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

151.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting ARIAD by prosecuting this action.  Therefore, demand on ARIAD and its Board is futile and is excused.

152.     ARIAD has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I
### *Against the Individual Defendants*
### *for Breach of Fiduciary Duties*

153.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.     The Individual Defendants owed and owe ARIAD fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe ARIAD the highest obligations of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

155.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

156.     The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information

concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ARIAD has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158.    Plaintiff, on behalf of ARIAD, has no adequate remedy at law.

## COUNT II
### *Against the Individual Defendants*
### *for Unjust Enrichment*

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ARIAD.

161.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to ARIAD.

162.    Plaintiff, as a shareholder and representative of ARIAD, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

163.    Plaintiff, on behalf of ARIAD, has no adequate remedy at law.

**COUNT III**

*Against Defendants Berger, Clackson, Fitzgerald, and Haluska for Misappropriation of Information and Insider Trading*

164.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.     At the time Defendants Berger, Clackson, Fitzgerald, and Haluska sold their ARIAD common stock they were officers and/or directors of ARIAD whose relationship gave them access, directly or indirectly, to material information about the Company not generally available to the public.

166.     These Defendants sold ARIAD securities at a time when they knew material information about ARIAD – gained from their relationship with the Company – which would have significantly affected the market price of ARIAD common stock and was not generally available to the public.

167.     These Defendants knew these facts were not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of ARIAD common stock.

168.     These Defendants had knowledge of material, adverse, non-public information about ARIAD, misappropriated this information for their own uses, and sold their ARIAD common stock on the basis of this information at artificially inflated prices in violation of their fiduciary duties.

169.     Plaintiff, as a shareholder and representative of ARIAD, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits and other benefits derived from their wrongful conduct and fiduciary breaches.

170.     Plaintiff, on behalf of ARIAD, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, unjust enrichment, and insider trading;

B.     Directing ARIAD to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ARIAD and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of ARIAD to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of ARIAD's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters;

- a proposal to establish an active and responsible scientific advisory committee or equivalent committee, and to enact a charter that sets forth

appropriate criteria for the appointment of qualified committee members, and which sets forth appropriate duties and responsibilities of such committee members directed to the review, vetting, and approval of material statements concerning the scientific safety, efficacy, or viability of the Company's  products or product prospects;

- a provision to implement and/or strengthen ARIAD's insider trading controls; and

- a provision to appropriately test and then strengthen the internal audit and control functions, including, without limitation, audit and control functions related to the Company's public statements about the safety and commercial viability or marketability of the Company's products or product prospects;

C.     Awarding to ARIAD restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation improperly obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully Submitted,

Dated: November 6, 2013

HUTCHINGS, BARSAMIAN,
MANDELCORN
& ZEYTOONIAN, LLP
THEODORE M. HESS-MAHAN, BBO
#557109

*/s/Theodore M. Hess-Mahan*
THEODORE M. HESS-MAHAN
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: 781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
Frankj@johnsonandweaver.com
SHAWN E. FIELDS
Shawnf@johnsonandweaver.com
NATHAN R. HAMLER
Nathanh@johnsonandweaver.com
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff YU LIANG*