UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| YU LIANG, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-12816-IT |
| | * | |
| HARVEY J. BERGER, et al., | * | |
| | * | |
| Defendants. | * | |

****************************************

| | | |
|---|---|---|
| ARKADY LIVITZ, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-13097-IT |
| | * | |
| HARVEY J. BERGER, et al., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

March 9, 2015

TALWANI, D.J.

I.  Introduction

Plaintiff brings this shareholder suit derivatively on behalf of ARIAD Pharmaceuticals, Inc. ("ARIAD"), against eleven directors and officers of ARIAD (collectively, "Defendants") for alleged breaches of fiduciary duty, misappropriation of confidential information and insider trading, and a violation of the Securities Exchange Act. In their Motion to Dismiss the Verified First Amended/Consolidated Shareholder Derivative Complaint [#29], Defendants contend that Plaintiff may not bring this suit to enforce rights of the corporation because he has not made a demand on the board of directors and has not sufficiently alleged that demand would have been futile. For the reasons set forth herein, Defendants' motion is ALLOWED.

II.   Procedural History

Yu Liang initiated this action on November 6, 2013, and on December 6, 2013, Arkady Livitz initiated a related action, which was consolidated with this case [#8]. Liang and Livitz subsequently designated Liang's complaint as the operative complaint [#17]. After the Defendants filed their first motion to dismiss [#19], Liang filed his Amended Complaint [#21]. Defendants' Motion to Dismiss the Verified First Amended/Consolidated Shareholder Derivative Complaint [#29] is now before this court.

III.   Background[1]

*A. The Parties*

Plaintiff has been a holder of ARIAD common stock. Verified 1st Am./Consol. S'holder Derivative Compl. ¶ 23 [#21] [hereinafter Am. Compl.].

Defendant Harvey J. Berger was ARIAD's Chairman of the Board, President and Chief Executive Officer. Id. ¶ 25. He served on ARIAD's Board of Directors together with Defendants Jay R. LaMarch, Athanese Lavidas, Massimo Radaelli, Norbert Riedel, Sarah Schlesinger, Robert M. Whelan, Jr., and Wayne Wilson. Id. ¶¶ 25-32, 37. Five of these Defendants—Berger, LaMarche, Radaelli, Whelen and Wilson—also served on the Audit Committee. Id. ¶¶ 26, 28-29, 31, 32, 38.

Defendants Timothy P. Clackson, Frank G. Haluska and Edward M. Fitzgerald are not members of the Board of Directors. Clackson was ARIAD's President of Clinical Research and Development and Chief Scientific Officer. Id. ¶ 34. Haluska was ARIAD's Senior Vice President

---

[1] Because the issues analyzed here arise in the context of a motion to dismiss, this court presents the facts as they are related in Plaintiff's amended complaint, see Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008), and construes those facts in the light most favorable to Plaintiff, see Pettengill v. Curtis, 584 F. Supp. 2d 348, 362 (D. Mass. 2008) (quoting Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007)).

of Clinical Research and Development and Chief Medical Officer. Id. ¶ 33. Fitzgerald was the Company's Executive Vice President, Chief Financial Officer and Treasurer. Id. ¶ 35.

All of the Defendants, except Schlesinger, are also named in a securities class action pending in this district. Id. ¶ 19 (citing In re ARIAD Pharm., Inc. Sec. Litig., No. 13-cv-12544-WGY (alleging securities fraud against ARIAD and Defendants Berger, Clackson, Fitzgerald, and Haluska and strict liability claims for violations of sections 11 and 15 of the Securities Exchange Act against Berger, Fitzgerald, LaMarche, Lavidas, Radelli, Riedel, Whelan, and Wilson)).

   B. *The Statements and Disclosures*

ARIAD's focus is the discovery, development, and commercialization of medicines to treat cancer patients. Id. ¶ 1. For years, ARIAD's primary focus has been on the development and commercialization of Iclusig (also known by its generic name, ponatinib), a medicine developed to treat certain forms of leukemia. See id. ARIAD has spent hundreds of millions of dollars developing Iclusig and has run increasingly large accumulated deficits in the process. See id. ¶ 4. ARIAD has repeatedly acknowledged that the commercial success of Iclusig is critical to ARIAD's success and viability. See id. ¶¶ 4 & n.1, 12.

ARIAD announced the development of Iclusig in March 2010. See id. ¶ 50. From mid-2010 through mid-2012, ARIAD shepherded Iclusig through a Phase I clinical study and the Phase II "PACE" clinical trial—necessary steps toward gaining FDA approval of the product. See id. ¶¶ 52, 53, 68. In July 2012, ARIAD announced its submission of a rolling New Drug Application to the FDA for Iclusig. Id. ¶¶ 10, 63; see id. ¶¶ 58, 61. With its New Drug Application, ARIAD submitted clinical data, including safety data, from the PACE trial collected through July 2012. See id. ¶¶ 10, 58, 61, 63.

3

On October 25, 2012, ARIAD's Director of Regulatory Affairs (who is not a defendant in this action) learned that the FDA harbored serious concerns regarding the safety of Iclusig. See id. ¶¶ 2, 8, 66. The FDA requested a face-to-face meeting to discuss its concerns "regarding the risks including liver failure, arterial occlusive and thromboembolic events observed in the safety population." Id. ¶¶ 66, 70. In its pre-meeting materials, the FDA explained that it "has taken the approach of labeling all clinically significant [treatment-emergent adverse events] regardless of attribution in prior approvals based on single-arm clinical trial(s)," id. ¶ 66, and recommended to ARIAD that it "should designate arterial thromboembolic events, vascular stenosis, or any other requirement for a vascular diagnostic or therapeutic procedure as adverse events of special interest, which would require enhanced data collection and submission of narratives for ongoing or planned clinical trials with ponatinib," id. ¶ 67.

On November 1, 2012, the FDA met with at least ten senior ARIAD representatives, including Defendants Clackson and Haluska. Id. ¶ 69; see id. ¶¶ 8, 66, 70. At the meeting, the FDA requested that the labeling for Iclusig be revised to address the FDA's safety concerns. See id. ¶¶ 8, 66, 70.

On November 5, 2012, ARIAD's Director of Regulatory Affairs submitted to the FDA a revised draft Iclusig label that had no box warning. Id. ¶ 71; see id. ¶ 9. The FDA responded the next day, reiterating its position that the label must include a box warning for arterial thromboembolic events, arterial stenosis, and hepatic toxicity. The FDA stated: "The Division's position regarding the inclusion of box warnings is firm. We refer you to our discussion during our face-to-face meeting on November 1, 2012." Id. ¶ 71; see id. ¶ 9.

On November 9, 2012, ARIAD filed with the SEC its Form 10-Q for the third quarter of 2012 without disclosing the FDA's concerns about Iclusig's safety and the box warnings

4

required by the FDA. Id. ¶¶ 10, 72. Instead, the Form 10-Q represented that the FDA was continuing to review ARIAD's Iclusig New Drug Application and that there had been no material changes to the risk factors included in ARIAD's 2011 Annual Report and second quarter 2012 Form 10-Q. See id. ¶¶ 72–75. Defendants Berger and Fitzgerald signed and certified this filing. Id. ¶ 72. The Audit Committee, which included outside directors/Defendants LaMarche, Radaelli, Whelan and Wilson, approved the Form 10-Q. See id. ¶¶ 10, 18, 75; see also id. ¶¶ 72–74.

Between December 9 and 11, 2012—over a month after the FDA had communicated its safety concerns and box warning requirements for Iclusig—ARIAD issued three press releases about Iclusig.[2] See id. ¶¶ 54–55, 76–79. Each of these press releases included safety profiles. See id. None of these press releases, however, mentioned any of the FDA's safety concerns from the previous month, nor did they mention the FDA's requirement that Iclusig be marketed with a black box warning. See id.

On December 14, 2012, ARIAD announced that the FDA had granted accelerated approval of Iclusig to treat patients with specified leukemia indications. See id. ¶¶ 11, 80, 81, 83. With this announcement, ARIAD disclosed for the first time the fact that serious arterial thrombosis had occurred in eight percent of Iclusig-treated patients. See id. ARIAD also disclosed for the first time that hepatoxicity, liver failure, and death had also occurred in Iclusig-treated patients; and that the FDA required ARIAD to market Iclusig with a black box warning. See id.

ARIAD promptly lost twenty percent of its stock-market valuation. Id. ¶ 11. ARIAD

---

[2] Plaintiff does not specify which Defendant or Defendants were responsible for the press releases. The complaint states only that "one or more of the Individual Defendants caused [ARIAD] to issue" the press releases. Id. ¶¶ 76–78.

continued to reassure investors and the public that Iclusig was safe, that its commercial market was broad, and that adverse events reported from patients treated with Iclusig were likely caused by preexisting conditions.[3] Id.

July 2012 was the cutoff for the PACE trial safety data submitted to the FDA with ARIAD's Iclusig New Drug Application. See id. ¶ 98. Since July 2012, ARIAD had been internally collecting and analyzing multiple months of additional safety data from the PACE trial which, by March 2013, showed that serious adverse cardiovascular events suffered by patients were increasing and that doctors were continuing to reduce dosage levels of Iclusig administered to patients. See id. ARIAD's continued collection and analysis of safety data from the PACE trial, collected from March 2013 through August 2013, likewise showed that serious adverse cardiovascular events suffered by Iclusig patients were increasing and doctors were continuing to reduce dosage levels for Iclusig. See id. ¶¶ 88, 99, 102–04, 109–10.

In March 2013, the enrollment criteria for the Phase III EPIC study were modified, expanding existing criteria and adding new criteria to exclude a broader universe of patients who had suffered certain cardiovascular events during the six-month period before enrollment. See id. ¶ 14. In July 2013, the dosage of Iclusig being administered to patients in another ongoing study was reduced downward from 45 mg (the FDA-approved dose) to 30 mg. Id.; see id. ¶¶ 52, 83, 105, 109, 123.

Despite these warning signs, ARIAD continued to make statements about Iclusig, including in its 2012 Annual report, filed March 1, 2013; in a April 2013 proxy statement; in its first-quarter 2013 quarterly report, filed in May 2013; and in its second-quarter 2013 quarterly

---

[3] Plaintiff does not specify which Defendants were responsible for these reassurances. The complaint states only that "the Individual Defendants continued to cause ARIAD to reassure the investing public." Id. ¶ 11.

report, filed in August 2013, that Plaintiff contends were false and misleading. See id. ¶¶ 84, 87, 96, 98, 99, 100, 107, 173, 177, 178, 185. Defendants Berger, Fitzgerald, LaMarche, Lavidas, Radaelli, Riedel, Whelan, and Wilson signed the March 1, 2013 filing. Id. ¶ 84. With regard to the April 2013 proxy statement, Plaintiff alleges that "the Audit Committee and/or Board made [the] decision to file the Proxy Statement." Id. ¶ 99. Defendants Berger and Fitzgerald signed the May 2013 filing, and Defendants LaMarche, Radaelli, Whelan, and Wilson reviewed and approved some of the statements made in that filing. Id. ¶ 100. With regard to the August 2013 filing, Plaintiff alleges that "one or more of the Individual Defendants caused [ARIAD] to file [the] quarterly report" but specify that Defendants Berger and Fitzgerald signed a certification on the report. Id. ¶ 107.

Plaintiff further alleges that during the same period in which Defendants learned of Iclusig's deteriorating safety profile but withheld information from the investing public, Defendants Berger, Clackson, Fitzgerald, and Haluska, who had closest access to and detailed knowledge of non-disclosed internal ARIAD information regarding Iclusig's safety profile, collectively unloaded hundreds of thousands of shares of their ARIAD stock, for proceeds of over $14.5 million. See id. ¶ 112.

On October 9, 2013, ARIAD disclosed Iclusig's safety profile, including an increase in serious arterial thrombosis among Iclusig-treated patients. See id. ¶¶ 15, 122, 127, 128. ARIAD further announced that enrollment in all Iclusig clinical studies would be paused, dosage of patients already enrolled in the EPIC study would be reduced, and eligibility criteria would be changed in clinical trials to further restrict the universe of patients who qualified for those trials. See id.

Two days later, the FDA announced that it was "investigating an increasing frequency of

7

reports of serious and life-threatening blood clots and severe narrowing of blood vessels (arteries and veins) of patients taking . . . Iclusig." Id. ¶ 126. Further, the FDA warned,

> [i]n clinical trials conducted before approval, serious arterial blood clots occurred in 8 percent of Iclusig-treated patients, and blood clots occurred in 3 percent of Iclusig-treated patients. In the most recent clinical trial data submitted by the manufacturer to the FDA, at least 20% of all participants treated with Iclusig have developed blood clots or narrowing of blood vessels.

Id.

A week later, ARIAD ceased enrollment in the EPIC clinical trial, again because of Iclusig's deteriorating safety profile. See id. ¶ 128. On October 31, 2013, ARIAD announced that it was temporarily withdrawing Iclusig from the market at the FDA's insistence. See id. ¶ 130.

From October 9, 2013 through October 31, 2013, ARIAD's stock declined by over eighty-seven percent, and ARIAD lost over $2.5 billion of market capitalization. See id. ¶¶ 127, 129, 131, 133.

IV.  Discussion

Defendants move to dismiss the amended complaint on two grounds: (1) that Plaintiff has failed to state a claim upon which relief may be granted; and (2) that Plaintiff failed to make a demand on the Board of Directors of ARIAD and failed to plead with particularity adequate reasons to excuse their failure to make such a demand.

   A.   *Pleading Standards*

      1.   Rule 12(b)(6)

On a motion to dismiss, a federal court "must assume the truth of all-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). But a court need not accept a pleading that offers "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

### 2. Rule 23.1 and Demand Futility

Federal Rule of Civil Procedure 23.1 imposes an additional pleading requirement on plaintiffs in stockholder derivative actions. Rule 23.1 contains, inter alia, a "demand" requirement. Specifically, a derivative complaint must "state with particularity[] (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); cf. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991) ("Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused . . . ." (emphasis omitted)).

In applying Rule 23.1, a court "must identify the source and content of the substantive law that defines the demand requirement." Kamen, 500 U.S. at 97. "[T]he circumstances in which a demand is required or, conversely, excused are determined by reference to the law of the state in which the corporation is incorporated." Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan v. UBS Fin. Servs. Inc., 704 F.3d 155, 163 (1st Cir. 2013). Here, because ARIAD is incorporated in Delaware, the parties agree that substantive Delaware law governs. Thus, the court must decide, as a matter of Delaware law, whether a pre-suit demand was necessary.

Under Delaware law, "the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993) (citing Levine v. Smith, 591 A.2d 194, 200 (Del. 1991)). The

Delaware Supreme Court has established "two interrelated tests for demand futility." Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan, 704 F.3d at 163 (citing Rales and Aronson v. Lewis, 473 A.2d 805, 813 (Del. 1984), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000)). If a plaintiff alleges that the board has made a conscious business decision in violation of its fiduciary duty—that is, the plaintiff challenges a board of directors' action or "conscious decision to refrain from acting"—the test under Aronson is used. Id. Under that test, the court must consider "'whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" Rales, 634 A.2d at 933 (alteration in original) (quoting Aronson, 473 A.2d at 813). If, alternatively, the board that would be considering the demand did not make a business decision that is being challenged, such as where a plaintiff alleges that the board failed to discharge its oversight duties, the test under Rales is used. Id. at 934. Under Rales, a demand is considered futile and is excused if "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Id.; see also Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan, 704 F.3d at 163.

"Reasonable doubt" means "that there is a reason to doubt." Grimes v. Donald, 673 A.2d 1207, 1217 (Del. 1996), overruled in part on other grounds by Brehm, 746 A.2d 244 ("[The] concept [of reasonable doubt] is sufficiently flexible and workable to provide the stockholder with the keys to the courthouse in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." (internal quotation omitted)). Reasonable doubt

does not mean "that a plaintiff must demonstrate a reasonable probability of success on the merits." Rales, 634 A.2d at 934.

"Independence" "'means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'" Id. at 936 (quoting Aronson, 473 A.2d at 816). A director's independence "may be compromised if he or she is so personally or financially beholden to an interested person, or an interested entity, that 'his or her discretion [is] sterilized.'" Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan, 704 F.3d at 164 (quoting Beam v. Stewart, 845 A.2d 1040, 1050 (Del. 2004) (citations omitted)). A director is considered interested "'whenever divided loyalties are present, or where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have 'a materially detrimental impact' on a director but not the corporation or its stockholders.'" Id. (quoting In re Verisign, Inc. Deriv. Litig., 531 F.Supp.2d 1171, 1189 (N.D. Cal. 2007); see also Rales, 634 A.2d at 936 ("In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.").

Finally, for a court to find that demand is futile due either to director interest or lack of independence, "a majority of the board of directors, or one-half of an evenly numbered board, must be interested or lack independence." Resnik v. Woertz, 774 F. Supp. 2d 614, 634 (D. Del. 2011) (citing Beam, 845 A.2d at 1046 n.8). A plaintiff's allegations of interest or lack of independence must be pled with specificity as to specific directors. Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan, 704 F.3d at 164 ("[W]e look to the individual directors rather than the board as a whole"). "[B]road group allegations about the director defendants" are

not permitted, In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 134 (Del. Ch. 2009) (citing In re AIG, Inc., 965 A.2d 763, 797 (Del. Ch. 2009)), because such allegations do not allow for "an analysis of the state of mind of the individual director defendants," id. (explaining that only "specific factual allegations . . . would allow for such an inquiry"). Likewise, simply pleading "that the director defendants 'caused' or 'caused to be allowed' the [c]ompany to issue certain statements is not sufficiently particularized pleading to excuse demand under Rule 23.1." Id. at 133 n.88 (explaining that vague allegations of causation do not specify "how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile").

### B. Counts I Through III: Demand Futility

Plaintiff argues that, pursuant to Rule 23.1 and related Delaware case law, demand was futile as to ARIAD's board of directors because there is reason to doubt that a majority of the board is independent and disinterested. See Opp'n Defs.' Mot. Dismiss Verified 1st Am./Consol. S'holder Derivative Compl., 11–17 [#31] [hereinafter Opp'n]. Defendants argue that Plaintiff has failed to plead particularized facts justifying their failure to make a pre-suit demand. See Mem. Supp. Defs.' Mot. Dismiss Verified 1st Am./Consol. S'holder Derivative Compl., 8–11 [#30] [hereinafter Defs.' Mem.].

Because ARIAD's board is comprised of eight members, Plaintiff is required to plead that demand would have been futile as to only four ARIAD board members. See Resnik, 774 F. Supp. 2d at 634. As to Defendant Berger—ARIAD's President, CEO, and Chairman of the Board—the amended complaint adequately alleges that he is disqualified from exercising independent, disinterested judgment. See Am. Compl. ¶¶ 187–89; see also id. ¶¶ 19, 169–70.

Plaintiff, however, has not sufficiently pled that demand would have been futile as to any

other director. Plaintiff contends that the outside directors are interested because they face personal liability.

A director may be interested if he or she faces a "substantial likelihood" of personal liability, Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003); see Rales, 634 A.2d at 936 (citing Aronson, 473 A.2d at 815). The mere existence of a lawsuit against the directors, however, is insufficient to excuse demand. See In re Sonus Networks, Inc., S'holder Derivative Litig., 499 F.3d 47 (1st Cir. 2007) ("[T]he fact that the director himself is named as a defendant in the suit does not create a reasonable doubt about whether the director is 'interested' in the decision about whether to bring the suit on behalf of the corporation." (citing Aronson, 473 A.2d at 809, 818)); see also Grimes, 673 A.2d at 1216 n.8 ("Demand is not excused simply because plaintiff has chosen to sue all directors. . . . To hold otherwise would permit plaintiffs to subvert the particularity requirements of Rule 23.1 simply by designating all directors as targets." (internal citation omitted)). Instead, "[t]he operative question is whether the Board could impartially consider the merits of a demand without being influenced by improper considerations." Pfeiffer v. Toll, 989 A.2d 683, 689 (Del. Ch. 2010), abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., 23 A.3d 831, 842 (Del. 2011).

Plaintiff argues that the directors, and in particular, those on ARIAD's Audit Committee, face a substantial likelihood of liability for (1) knowingly or recklessly authorizing the disclosure of materially false or misleading statements in certain of the company's public filings, and/or (2) failing to act in good faith to discharge their duties to exercise reasonable inquiry, oversight, and supervision over the company. See Am. Compl. ¶¶ 171-75. Plaintiff argues that "the massive liability exposure posed by the instant litigation rendered each Director Defendant interested." See Opp'n, 12.

Liability based on these allegations is premised on the directors (1) violating the securities laws, or (2) committing a breach of the duty of loyalty, see In re Caremark Int'l Derivative Litig., 698 A.2d 959 (Del.Ch.1996); Stone v. Ritter, 911 A.2d 362 (Del. 2006), respectively. As to (2), liability under Caremark "requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith" and is premised "on a showing that the directors were conscious of the fact that they were not doing their jobs." Guttman, 823 A.2d at 506. It is not enough for a plaintiff to allege that defendants "'should have known or must have know[n] about matters relating to the corporation's core business.'" In re Coinstar Inc. S'holder Derivative Litig., No. C11-133, 2011 WL 5553778, at *4 (W.D. Wash. Nov. 14, 2011) (quoting In re Accuray, Inc. S'holder Derivative Litig., 757 F. Supp. 2d 919, 928 (N.D. Cal. 2010)). As to (1), liability for knowingly or recklessly authorizing the disclosure of materially false or misleading statements in violation of the securities laws requires that the outside directors acted with scienter.

Plaintiff has not put forth sufficient particularized factual allegations demonstrating that the outside directors are subject to a substantial likelihood of liability based on these claims because they do not sufficiently plead that the outside directors either consciously ignored their duties under Caremark or acted with intent in authorizing the disclosure of materially false or misleading statements. In the amended complaint, Plaintiff alleges that the Audit Committee approved certain public filings, such as the 2012 Annual Report, an April 2013 Proxy Statement, the Q1 2013 Form 10-Q, and the Q2 2013 Form 10-Q, that contained materially false or misleading statements or omissions, despite those directors' actual or constructive knowledge of such statements or omissions. For example, in connection with the filing of the 2012 Annual Report, Plaintiff alleges that the "Audit Committee Defendants directly or indirectly received (or,

14

in order to discharge their duties to remain vigilant and knowledgeable about the clinical data being collected and Iclusig's evolving safety profile, should have demanded and received)" certain reports relating to the ongoing collection of clinical safety data for Iclusig. Am. Compl. ¶ 88. Plaintiff includes no facts to support the claim of actual knowledge that the challenged disclosures contained false or misleading statements. The court must, therefore, consider only the claim that such defendants should have had such knowledge.[4]

The amended complaint describes the role and responsibilities of the Audit Committee, and, based on this role and responsibility, imputes constructive knowledge to the directors of the Audit Committee that the company's disclosures, which they approved, were deficient. These allegations, however, "leave[] . . . too much to the imagination," Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *14 (Del. Ch. Sept. 30, 2003), and are insufficient to establish a substantial likelihood of liability based on the directors' conscious disregard of their duties or an intent to deceive. Merely alleging, for example, that the outside directors should have received reports relating to the FDA's issues with Iclusig's safety and labeling, without more, does not amount to a substantial likelihood of liability. Although the amended complaint may have alleged the threat of personal liability to the directors on the Audit Committee, where such threat is not substantial it "does not constitute a disabling interest for a director considering a derivative plaintiff's demand." Id. at *9.

Other than in connection with certain of the company's public filings, the amended complaint does not allege that any outside directors were responsible for any other of ARIAD's

---

[4] In one paragraph of the Amended Complaint, Plaintiff omitted the qualification that the Audit Committee directors may have only possessed constructive knowledge of that information. Am. Compl. ¶ 75. At the March 2, 2015 hearing on the motion to dismiss, Plaintiff's counsel clarified that Plaintiff had no additional facts concerning the outside director Defendants' knowledge, and that the allegation contained in paragraph 75 should have contained the qualification that the Audit Committee directors may have only possessed constructive knowledge.

alleged misstatements or misleading omissions. With respect to the two misstatements made on conference calls with investors, Plaintiff alleges that Berger made these misstatements but does not allege that any of the outside directors participated in the calls or were even aware of the calls or Berger's statements. See Am. Compl. ¶¶ 93, 106. With respect to the four misstatements made in ARIAD's press releases, Plaintiff alleges only that "one or more of the Individual Defendants caused the Company to issue" the press releases. Am. Compl. ¶¶ 76, 77, 78, 104. Because the "Individual Defendants" include both director and non-director defendants, this allegation is insufficient to show that all outside directors were interested. Further, the allegation is insufficient under Rule 23.1 because simply pleading "that the director defendants 'caused' or 'caused to be allowed' the [c]ompany to issue certain statements is not sufficiently particularized pleading to excuse demand." In re Citigroup, 964 A.2d at 133 n.88.

Plaintiff also points to a securities action currently pending in this district in which six of the outside directors are named defendants. See Opp'n, 11. In that action, the plaintiffs contend that the outside directors are strictly liable under Section 11 of the Securities Act of 1933 for the alleged materially false and misleading statements made in connection with the company's January 24, 2013 stock offering. Whether the directors face a substantial likelihood of liability in that action appears to have little bearing here, where Plaintiff does not base any of his claims on the January 2013 stock offering, and Plaintiff fails to plead otherwise in his amended complaint. See Am. Compl. ¶ 19 (stating only that "a securities class action complaint against the Company's officers and directors" had asserted "violations of Section 11 of the Exchange Act").

In sum, Plaintiff has failed to show that pre-suit demand would have been futile and Defendants' motion to dismiss is therefore allowed as to Counts I through III.

C.      *Count IV: Violation of Section 14(a) of the Securities Exchange Act*

Count IV asserts a violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9, promulgated thereunder. Count IV is premised on Plaintiff's contention that a proxy statement which asked the company's shareholders to approve executive compensation on an advisory basis failed to disclose (1) the FDA's concerns about Iclusig's safety; (2) the agency's demand that ARIAD continue to monitor and document safety data from the PACE trial; (3) ARIAD's resulting monitoring efforts, which were ongoing in April 2013; or (4) changes that ARIAD had made to the enrollment criteria for the Phase 3 trial of Iclusig. Am. Compl. ¶¶ 95, 212. Plaintiff contends that disclosure "of the truth would have ended the shareholders' support for compensation of the senior executives and reelection of directors." Id. ¶ 215.

Section 14(a) makes it unlawful to solicit shareholder proxies in contravention of the SEC's rules and regulations, 15 U.S.C. § 78n(a), and Rule 14a-9(a) bans proxy solicitations that contain false or misleading statements of material fact, or that "omit[] to state any material fact necessary in order to make the statements therein not false or misleading," 12 C.F.R. § 240.14a-9. To state a claim under Section 14(a), a plaintiff must allege that: "'(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" N.Y.C. Emps.' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007)). "The need to plead and prove a transactional nexus in a proxy solicitation case is not legitimately in doubt." Royal Bus. Grp., Inc. v. Realist, Inc., 933 F.2d 1056, 1063 (1st Cir. 1991) (citing Gaines v. Haughton, 645 F.2d 761, 775 (9th Cir. 1981), overruled in part on other grounds by In re McLinn, 739 F.2d 1395, 1397 (9th Cir. 1984)). A

plaintiff makes a sufficient showing of a causal relationship between a violation and an injury if he or she proves that the proxy solicitation "'was an essential link in the accomplishment of the (corporate) transaction.'" Gaines, 645 F.2d at 775 (quoting Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385 (1970)). Transactional causation exists only if the underlying corporate transaction required shareholder approval. Id.; cf. Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1089, 1105 (1991) (holding that an "essential link" cannot be established if the underlying transaction was put to the shareholders for a purely "cosmetic vote" that was "unneeded to authorize action").

Here, the amended complaint does not sufficiently allege such a causal link between the proxy statement and ARIAD's alleged injury.[5] Insofar as Plaintiff claims that ARIAD was injured by the payment of compensation to Berger, Clackson, Fitzgerald, and Haluska, the claim fails to allege that the underlying corporate transaction (between ARIAD and the compensated executives) required shareholder approval. See Gaines, 645 F.2d at 775. Indeed, Plaintiff acknowledges that the proxy statement asked the company's shareholders to approve executive compensation only "on an advisory basis." Am. Compl. ¶ 95. The proxy statement itself was even clearer: it told the shareholders that their votes were sought on "an advisory basis" with respect to executive compensation but told them that "[b]ecause your vote is advisory, it will not be binding on our Compensation Committee or our Board of Directors." Defs.' Mem., Ex. A, at

---

[5] Specifically, the complaint alleges:

> The inaccuracies and omissions in the Proxy Statement were essential for the continuation of the Individual Defendants' misconduct. Disclosure of the truth would have ended the shareholders' support for compensation of the senior executives and reelection of directors. Accordingly, as a direct and proximate result of a materially inaccurate and incomplete Proxy Statement, ARIAD suffered direct and significant harm.

Am. Compl. ¶ 215.

57 [#30]; see also 15 U.S.C. § 78n-1(c) (making clear that shareholder approval is not needed to determine executive compensation).

The amended complaint also fails insofar as Plaintiff claims that ARIAD was injured because a full disclosure in the proxy statement "would have ended the shareholders' support for . . . reelection of directors." Am. Compl. ¶ 215. Although shareholders' votes were binding on this issue, the reelection of directors does "not create any cognizable harm [for purposes of the Exchange Act] because the shareholders' votes did not authorize the transactions that caused the losses." Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 933 (3d Cir. 1992) (citations omitted).[6]

For the foregoing reasons, Plaintiff has failed to state a claim for which relief may be granted in Count IV. Count IV is therefore dismissed.

V. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss the Verified First Amended/Consolidated Shareholder Derivative Complaint [#29] is ALLOWED.

IT IS SO ORDERED.

Date: March 9, 2015                                    /s/ Indira Talwani
                                                       United States District Judge

---

[6] Plaintiff appears to concede that transactional causation exists only if the underlying corporate transaction required shareholder approval. See Opp'n, 21. That is, Plaintiff argues that Defendants would be correct that they had no duty to disclose alleged mismanagement in the proxy statement as long as Plaintiff's Section 14(a) claim was "based on something other than a matter the Board sought shareholder approval for and that required shareholder approval." Id. Plaintiff argues, rather, that the proxy statement required shareholder approval because a vote on the Board's executive compensation decisions was required under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), 15 U.S.C. § 78n-1. This argument fails because Dodd-Frank explicitly provides that such shareholder votes are not binding and do not "create or imply any change to the fiduciary duties" of the Board. See id. § 78n-1(c).